## DANIEL vs. GUY ET AL.

Where a person, held as a slave, sues for freedom, and it manifestly appears that he belongs to the negro race, whether of full or mixed blood, he is presumed to be a slave, that bring the condition generally of such people in this State.

If it appear that he belongs to the white race, he is presumed to be free.

If it be doubtful, whether he belong to the white, or the negro race, there is no basis for legal presumption one way or the other; but it is safest to give him the benefit of the doubt.

Slavery and not freedom being generally the status of the negro race in this State, no presumption arises, in suits for freedom, that the plaintiff is free, from the fact that he is less than one-fourth negro.

8

The fact that the plaintiffs, in a suit for freedom, or their ancestors have been actually held in slavery, or their words and acts in that position, are not conclusive evidence that they were rightfully held in slavery; but if the plaintiffs and their mother were long held as slaves, treated and acted as such, this was prima facie evidence of the right to hold them as slaves.

Where it is stated on the face of the declaration, in a suit for freedom by several, that the plaintiffs are the "mother and her minor children," the defendant would hardly be required to prove the fact so admitted.

An instruction that every presumption, consistent with reason, should be indulged in favor of freedom, is too general and abstract, in a suit for freedom, to be of any practical legal advantage, unless the Court should also tell the jury what presumptions it considered consistent with reason.

If the plaintiff's mother, in a suit for freedom, was always held and treated as a slave, and the plaintiff herself so held, treated and acted, it is prima facie evidence that she and her children are slaves, unless they were emancipated.

Persons skilled in the natural history of the races of men, are competent witnesses to state the distinguishing marks between the negro and the white race, in suits for freedom, when the issue depends upon the question whether the plaintiffs belonged to the one race or the other.

The jury are the judges of the weight of the evidence.

The plaintiffs petitioned the Court for permission to sue as paupers, stating the grounds upon which they claimed to be free; the defendant filed an answer controverting the grounds stated in the petition: the Court, on motion, struck the answer from the files; *Held,* That the defendant could not have read his answer as evidence on the trial; and there was no error in striking it from the files.

Where an exception is not made one of the grounds of a subsequent motion for a new trial, it is waived.

*Appeal from the Circuit Court of Ashley county.*

The Hon. Theodoric F. Sorrels, Circuit Judge.

Yell, for the appellant.

Pike & Cummins, for the appellees.

Mr. Chief Justice English delivered the opinion of the Court.

This was a suit for freedom, determined in the Ashley Circuit Court, at the April term, 1855.

The action was brought against William Daniel, by five persons, who are described in the declaration as "Abby Guy, Elizabeth F. Daniel, Mary Daniel, John Guy, and Malissa

Ann Arnold, the four latter being minors, and suing by their *mother*, and next friend, the said Abby Guy."

The form of the action was trespass for false imprisonment, under the statute (*Dig.*, *ch.* 74,) the declaration alleging that the plaintiffs were free, but held in slavery by the defendant. The defendant interposed two pleas; first, not guilty; and second, that the plaintiffs were slaves, and his property, etc.; to which issues were made up, tried by a jury, verdict in favor of plaintiffs, and judgment that they be liberated. The defendant moved for a new trial, which the Court refused, and he excepted, and appealed.

It is necessary to state the substance of the evidence introduced upon the trial, and set out in the bill of exceptions, in order to understand the decisions of the Court upon questions of law, which are complained of as erroneous, etc.

## ON THE PART OF THE PLAINTIFFS.

*Richara Stanley* testified, that several years ago, Abby spoke to him to move her and her children: he asked the defendant if he could do so, and he said he had nothing to do with her. Witness asked him who would pay him for it, and he said Abby could pay him. Defendant was then living in the Hills, and plaintiffs on Bayou Bartholomew. Abby was working for herself, making and selling her own crops. Plaintiffs passed as free persons. The oldest girl boarded out, and went to school. They lived eight or nine years on the Bayou, visited among white folks, and went to church, parties, etc.,—should suppose they were white. They lived part of the time with a man named *Guy*, and Abby passed as *Mrs. Guy*, but witness did not know that she was married to him.

" Here the plaintiffs were personally presented in Court, and the judge informed the jury that they had the right, and should treat their observation and inspection of plaintiffs' persons as evidence; and might and should apply, in the observation of their persons, their knowledge of the distinction between the negro and the white races, and such rules as might be proven

to them to be reliable means of determining the existence of
negro descent or negro blood." To which the defendant
objected, and excepted.

*Wm. M. Ducker* testified that he was sheriff of Ashley
county, from 1849, until the last general election before the
trial. The defendant listed his slaves for taxation by families,
and not by name. He would name the head of the family, and
make a gross estimate of their value. Witness could not say
whether the plaintiffs were included in any of such lists or not.
*Abby* was never named in making the lists. Witness never
thought of taxing her, as the law *exempted widows*, and he
passed her without enquiry. She was living with Guy when
witness came to the State, and when he died, he gave her a
tract of land, etc.

*Jeremiah Oats* testified that, when he first came to the State,
he hauled some cotton for Abby. A year afterwards, she
wanted him to move a fence. Having heard that defendant
had control of her, witness spoke to him about doing the work,
and asked him who would pay him for it. He said he had
nothing to do with it. Witness told him *they* called her a negro.
He said *they* could not prove it. That she could make her own
contracts, and pay her own debts out of her property, and that
witness could deal with her as he pleased.

*K. Saunders* testified that he had talked a great deal with
defendant about Abby, but never heard him say 'she had no
negro blood in her. It was understood that he had title papers
to her. Witness had heard him say so. When she lived on
the Bayou, she managed her own business, as a free woman,
and visited among the whites as an equal. Defendant came
to Arkansas in 1844, and from thence until just before suit,
plaintiffs had lived to themselves, as free persons—had lived in
this State during that time, except a year or two past, they
moved to, and lived in Louisiana. A short time before suit,
defendant took them in possession as slaves, and treated them
as such when the action was brought.

*A. Bull* testified that, in 1849, he stepped into the court-house

(in Ashley county,) while the defendant was talking to the judge, respecting some matter apparently before the Court, and heard him say, that no person, except himself, could prove that Abby had a drop of negro blood in her, and he could not do it without reference to his papers; and he did not know that he could do it then, etc.

## FOR THE DEFENDANT.

*Thos. S. Thompson.*—Had known Abby since 1822, when she was a little girl, and was living with James Condra (who married defendant's sister Betsey). Also knew Abby's mother, Polly, generally called "*Aunt Polly*," who was a yellow woman, darker than white—a tolerably *bright mulatto*, and a shade darker than Abby. Could not say whether *Polly* was of African or Indian extraction. Had seen half-breeds as white as she was. She was then in advanced age, was called a *mulatto*, and had the appearance of such. When witness first knew her, she was the slave of defendant's mother, who lived with him. Polly was under his control, with other slaves of his mother.

Witness knew Abby first at Condra's. She afterwards lived both with Nathaniel Daniel (defendant's brother,) and defendant. The latter brought her from Alabama to Arkansas. Never knew her to claim to be free. Knew her and her mother both as slaves. *Polly* had dark straight hair—had a *curl* on the side of her head. Hair dark as Abby's. She had other children besides Abby, who were slaves; and she always held herself as a slave, and acted as such. She and Abby always labored and conducted themselves as slaves in the family, with the exception that they took more care of themselves perhaps than others. *Polly* wore her hair long, with a comb—was a house servant, the cook, usually wore a cap, and took good care of herself—she called defendant Master *Billy*. Witness was brother-in-law to defendant—had never studied *Physiology*, nor the distinction of races. Had seen persons darker than Abby without any stain of negro blood. Had seen women, who were in the habit of working in the field, get to

be almost as dark as mulattoes, and as dark or darker than Abby's mother. Had seen Portugees and Spaniards as dark as she was. She died several years before witness left Alabama. Abby came with defendant from Alabama to Arkansas, and witness never had any other idea than that he brought her, always looking upon her as a slave. She went on the Bayou to live, etc. Had seen white person's hair curl as much as Abby's mother's. Witness did not know whether she had any negro blood in her veins or not. He only inferred so from her being treated as a slave, and from her dark color. If negro at all, she was a very bright mulatto.

*James Barnett*—was forty years old, and had known the defendant and *Abby* all his life. Had seen the other plaintiffs. *Abby* belonged to James Daniel, father of defendant, and (maternal) grand father of witness, when he first knew her. Had seen her in the possession of James Condra as a slave, and afterwards in the possession of defendant. Witness also knew her mother, when she lived with his grand father. She was a slave, not black nor white—could not speak positively as to her color, she having been dead fifteen years—she was not to say black, nor as white as some—not a dark mulatto. Her hair was about straight, might have been somewhat kinky. From appearance she was not white—was a shade darker than Abby. Had seen persons recognized as white, who were as dark as Polly—not certain that her hair curled, or was kinky.

*James Kates.* Had known defendant and Abby for thirty years. First knew her at James Condra's. Knew her mother Polly, who was of the color of a bright mulatto. First knew her at defendant's. She was serving as a slave. Abby called defendant Master William.

*K. B. Thompson.* Knew Abby in Alabama. Also her mother. She was a mulatto, a bright mulatto, say of the complexion of a dark white person. Defendant brought Abby to Arkansas. She called him Master Billy. Witness did not know, and could not say that Polly had any negro blood in her. Her color was dark, she was treated as a slave, and he called

her a mulatto. Her hair was long and straight, but witness did not remember that it was kinky or curly, thought it might have been one or the other.

## FOR PLAINTIFFS.

*Dr. Newton*—Had read Physiology. There are five races— the negro is the lowest in intellect. Some physiologists are of the opinion that in the head of the mulatto, there is some negro hair, and some white hair, and that the negro hair never runs out. It would not run out before it passed the second generation. It may in the third generation have waves. The color, hair, feet, nose, and form of the skull and bones furnish means of distinguishing negro blood or descent. The hair never becomes straight until after the third descent from the negro, from neither the father or mother's side. The flat nose also remains observable for several descents.

*Dr. Comer*—Heard the last witness, and corroborated his statements.

HARVARD LAW SCHOOL LIBRARY.

## FOR THE DEFENDANT.

The defendant introduced the will of his father, James Daniel, made in 1820, and admitted to probate, in Green county, Alabama, in 1821, from which it appears that the testator devised Abby *as a " negro girl slave "* to his daughter Betsey Condra. He also devised a number of " *negroes*," amongst whom *Polly* is named, to his son William (the defendant,) for the use of his (the testator's) wife during her life, and then to be distributed, with their increase, equally among his children. It also appears from a transcript of the proceedings of the said Probate Court, in connection with the will, that in 1835, and perhaps after the death of James Daniel's widow, his executors returned an inventory of the slaves devised for her use, among whom is named " *a negro woman Polly*." It moreover appears that these slaves were distributed among the descendants of the testator, according to the provisions of the will, and Polly was

allotted to *Betty Burton's heirs*, and *valued at* $300, by commissioners appointed by the Court to make the division. ·

The defendant also introduced a bill of sale. executed to him by James Condra, on the 23d June, 1825, conveying to him, for the sum of $400, in hand paid," "*one negro girl named Abby*," thirteen years old," etc., warranting the title, etc.

The defendant also read in evidence an instrument executed 2d July, 1842, by Nathaniel Daniel, by which he relinquished all his right, title, claim and interest "*in a certain negro woman named Abby*, and her children Frances, Elizabeth and Mary, unto Wm. Daniel (defendant,) for the balance that I (Nath. Daniel,) am due him for the purchase money for said negroes."

The defendant offered to read in evidence the will of Nathaniel Daniel, dated in August, 1842, by which a number of slaves were devised to him, etc. But the Court excluded it. Neither of the plaintiffs appears to be mentioned in this will.

The above being the substance of the evidence introduced by the parties, the Court, on the motion of plaintiffs, and against the objection of defendant, instructed the jury as follows:

1st. The only issue for the jury to try upon all the evidence before them, is whether the plaintiffs were free persons or slaves.

2d. In settling that issue, the jury should govern themselves by the following rules of law:

1st. If the jury find, from the facts and evidence before them, that plaintiffs had less than one-fourth of negro blood in their veins, the jury should find them to be free persons upon that fact alone—it being *prima facie* evidence of freedom—unless defendant, on his part, had proven them to be slaves—and

2d. If said plaintiffs are found to be less than one-fourth negro, then defendant can only prove them to be slaves, by proving, to the satisfaction of the jury, that said plaintiffs are descended from a slave on the mother's side, who was one-fourth

negro or more, (and if she) were less than one-fourth negro, that would be *prima facie* evidence of freedom in her.

3d. The fact that plaintiffs or their ancestors, have been actually held in slavery, or their words and acts in that position are not conclusive evidence that they were rightfully held in slavery; and the only satisfactory proof of such *right*, is the fact that they are descended from a negress, or a woman one-fourth negro, who was a slave.

4th. Even though they should find Abby to be a slave, still the jury should find the other persons to be free, unless it has been proven that they are one-fourth negro, or are the children of Abby, a slave, or other slave, who is one-fourth negro.

5th. That, observing the (principles) premises before laid down, every presumption, consistent with reason, should be indulged in favor of freedom.

The defendant moved the following instructions, all of which the Court refused to give but the *fourth*:

1st. If the jury believe from the evidence, that Abby's mother *was a slave*, and that *she was always known and held as a slave*, it is *prima facie* evidence that Abby and her children are slaves.

2d. If the jury believe, from the evidence, that Abby's mother was a *negro*, or *of negro extraction*, and was *always held and known as a slave*, that is *prima facie evidence* that Abby was, and is, a slave.

3d. If the jury believe, from the evidence, that Abby has always been *known and held as a slave for the last thirty years*, and during that time *called William Daniel " Master," and acted as his slave, it is evidence she is a slave, unless she has been set free by law*.

4th. Party in Arkansas can only emancipate a slave by will or deed, under statute.

5th. All evidence on Physiology, is irrelevant, and not to be considered by the jury as evidence herein.

6th. If the jury believe, from the evidence, that the plaintiffs were legally held as *slaves* in *Alabama*, and have negro

blood in them, they are slaves .unless they have been emancipated by the laws of Arkansas."

The grounds upon which the new trial was asked, are as follows:

. 1st. The instructions of the Court are contrary to law.

2d. Verdict contrary to evidence.

3d. Verdict and judgment contrary to law and evidence.

4th. The Court excluded legal evidence.

5th. The Court struck from the files the answer of defendant to the petition of plaintiffs to be allowed to sue as paupers, etc.

1. The first ground upon which the appellant moved for a new trial, is, that the instructions of the court were contrary to law.

In the first instruction, the court correctly charged the jury, that the only issue for them to determine was, whether the plaintiffs were free persons or slaves; and it is manifest from the evidence, that this issue properly turned upon the question, whether they belonged to the *negro* or to the *white* race. If to the former, there could be but little doubt, that they were slaves; if to the latter, of course they were free.

The second instruction was sub-divided into five propositions, which the court gave in charge to the jury as *" rules of law."* The *first* and *second* of these propositions assert, in substance, that if it appeared from the evidence, that the plaintiffs were less than *one-fourth negro*, they were presumed to be free, and the burthen of proving them to be slaves was upon the defendant. Is this the law? ·

The 12th section of the act regulating suits for freedom (*Dig. ch.* 74) declares that: "If the plaintiff be a negro or mulatto, he is required to prove his freedom."

In what sense is the term *mulatto*, as here used, to be understood?

Strictly and technically, the word *mulatto* means a person born of one white and one negro parent. *Bouvier; Webster;*

*Medway vs. Nantic,* 7 *Mass. R.* 87; *Thurman vs. The State,* 18 *Ala.* 276.

In the Spanish and French West Indies, persons who belong to the negro race, but who are not full negroes, are distinguished by the following grades:

The *first* grade is that of the *mulatto,* which is the intermixture of a white person with a negro. The *second* are the *terceroncs,* which are the production of a white person and a mulatto. The *third* grade are the *quartcroncs,* being the issue of a white person and a *tercerone:* and the last are the *quinteroncs,* being the issue of a white person and a *quartcrone.* Beyond this there is no degradation of color, not being distinguishable from white persons, either by color or feature. *Wheeler on Slavery, p.* 5, *note.*

In our legislation, no such classification has been recognized. The term *mulatto* is frequently used in our statutes, but manifestly in a more comprehensive sense than it technically imports, as we shall presently see.

By the first section of *chap.* 75, *Digest,* a *mulatto* is defined to be a person who is not full negro, but who is *one-fourth* or more negro. This chapter prohibits the emigration of free negroes and mulattoes to this State, and prescribes police regulations for those living here. For all the purposes of this chapter, the word *mulatto* must be understood as here defined.

Hence, notwithstanding this act, free persons belonging to the negro race, but being less than *one-fourth negro* may emigrate to and settle in this State, and are exempt from the police regulations prescribed by the act.

But are we to apply this definition to the word *mulatto* wherever it occurs in our statutes? Let it be assumed as a hypothesis, that it must be so defined, and let us see what will be the consequences in the construction of the statutes where the word occurs.

In considering the statutes, to which we shall refer, it must be borne in mind, that persons less than one-fourth negro may be legally held in slavery here. The rule is, that the child

takes the condition of the mother, and if the mother belong to the negro race, though but one-fourth negro, or less, and is a slave, the child will also be a slave; and we have no statute fixing a limit to this rule.

" No negro or *mulatto*, bond or free, shall be a competent witness in any case, except in cases in which all the parties are negroes or *mulattoes*, or in which the State is a plaintiff, and a negro or *mulatto*, etc., defendant. *Digest, chap.* 171, *sec.* 25.

If the term *mulatto*, as here used, is to be understood as defined above, (by *sec.* 1, *chap.* 5, *Digest*,) it follows that a slave, who is less than *one-fourth negro*, would not be an incompetent witness for or against his master, or other white person, by virtue of this statute. But such construction would be at war with the policy of the act. It would let in a part of the mischief which the statute was intended to prevent.

Again: Any person illegally restrained of his liberty may, upon *habeas corpus*, be set at liberty by any competent court or judge. *Digest chap.* 81. But *section* 8 *of Art. III, same chapter*, declares that: " No negro or *mulatto*, held as a slave, etc., shall be discharged, nor shall his right of freedom be had (tried) under the provisions of this act."

The reason for denying slaves the benefit of habeas corpus, is manifest. They are property as well as persons, and if they could be discharged from bondage by a judge in vacation, or term, the owner might be deprived of his property without due course of law, there being no provision for trial by jury, etc., on the hearing of the writ of *habeas corpus*.

Yet, if the term *mulatto*, as here used, is to be understood as above defined, the slave, who has less than one-fourth of negro blood in him, is not, by this section, cut off from the privilege of *habeas corpus*.

Take another example:

" Any slave convicted of stealing any negro or mulatto slave," etc., shall be punished, etc. *Digest, p.* 380, *sec.* 8.

If the term *mulatto*, as used in this section, does not embrace

slaves who are less than one-fourth negro, under what law would a slave be punished for stealing such slaves?

Another example:

By *sec.* 1, *p.* 340, *Dig.*, it is made a penitentiary offence for any person to induce any negro or *mulatto* slave to abscond from his owner, etc.

If the slave be less than one-fourth negro, and the definition of the word *mulatto*, above referred to, is to be applied to the term as used in this act, how would the person enticing such slave from his owner be punished?

And another:

" All marriages of white persons with negroes or *mulattoes* are declared to be illegal and void." *Dig.; chap.* 102, *sec.* 4. Under the above definition of the term *mulatto*, would the law recognize a marriage between a white man and woman of the negro race, but less than a fourth negro?

Other examples might be given if deemed necessary. See *Dig.*, *p.* 331, *sec.* 9; *p.* 378, *sec.* 1.

To apply to the word *mulatto* its strict technical meaning (*half negro*), the consequences in the construction of the several statutes which we have referred to, would be still more absurd. *Slaves*, etc., less than half negro would not be included. In construing a statute, an interpretation must never be adopted that will defeat its purpose, if it will admit of any other reasonable construction. 9 *Wheat.* 381. And the court must consider the policy of the statute, and give it such interpretation as may appear best calculated to advance its object by effectuating the design of the legislature. 3 *Ham.* 198.

To apply the technical definition of the word *mulatto*, (*half negro*,) or the definition contained in *sec.* 1, *ch.* 75, *Dig.*, (*fourth, or more, but not full negro*,) to the several statutes noticed above, would, to some extent, defeat the purpose, and not advance, but produce a departure from, the policy of the statutes.

The legislature, in the acts referred to, (except in *chap.* 75, *Dig.*,) have manifestly used the word in a more latitudinous sense, and in a sense in which it is generally understood, we

presume, by the people of this State. That is, they meant to embrace in the term *mulatto*, persons belonging to the *negro race*, who are of an intermixture of white and negro blood, without regard to grades.

With the above understanding of the meaning of the term *mulatto*, as used in our legislation generally, we think the following would be safe rules of evidence.

1. Where a person held as a slave, sues for freedom, and it manifestly appears that he belongs to the *negro race*, whether of full or mixed blood, he is presumed to be a slave, that being the condition generally of such people in this State.

2. If it appear that he belongs to the white race, he is presumed to be free.

3. If it be doubtful, whether he belong to the white or the negro race, there is no basis for legal presumption, one way or the other, but it is safest to give him the benefit of the doubt, as the courts should be careful that a person of the white race be not deprived of his liberty.

To some extent the following authorities support the above rules of evidence. *Hook vs. Pagu et al.*, 2 *Munf.* 379; *Hudgins vs. Wright*, 1 *Hen. & Munf.* 134; *State vs. Davis, et al.*, 2 *Bailey* 558; *Wheeler L. S.* 4.

If, in this State, all persons who belong to the negro race, but who are less than one-fourth negro, were free, or if that were the status of such people generally, then the rule might well be, that in suits for freedom, whenever it appears that the plaintiff was less than one-fourth negro, he should be presumed to be free. But slavery, and not freedom, is the status generally of such people. The few who have been liberated, and the rare offspring of a *white mother*, by a father mixed with negro blood, constitute but exceptions to the general rule.

The third proposition, or sub-division of the second instruction given in charge to the jury, by the court, at the instance of the plaintiffs, may be divided into two distinct clauses: The first clause is as follows: " The fact that plaintiffs, or their ancestors, have been actually held in slavery, or their words and

acts in that position, are not conclusive evidence that they were rightfully held in slavery." It is doubtless true that such evidence is not conclusive. But it is equally true, as we shall see when we come to consider the instructions moved by the defendant, that if the plaintiffs and their mother were long held as slaves, treated and acted as such, this was prima facie evidence of the right to hold them as slaves.

The second clause is: " that the only *satisfactory* proof of such *right* is the fact that they are descended from a negress, or a woman one-fourth negro, who was a slave."

No one can be legally held in slavery in this State, who is not descended from a female slave of the negro race: but if the jury were satisfied, from the evidence, that the mother of Abby and the grand-mother of the other plaintiffs, belonged to the negro race, and was a slave, this was sufficient to fix the status of the plaintiffs, though the testimony might not have shown whether Abby's mother was half, fourth or eighth negro. The language employed in the clause copied above was therefore too broad.

The fourth proposition is: " Even though they should find Abby to be a slave, still the jury should find the other persons to be free, unless it has been proven that they are *one-fourth* negro, or the children of Abby, a slave, or other slave, who is one-fourth negro."

That the four minor plaintiffs were the children of Abby was stated on the face of the declaration, and the defendant would hardly be required to prove a fact so admitted. There was no controversy between the parties as to this. Nor was it necessary for it to be proven that these minors, or their mother, were *one-fourth negro*. If Abby was of the negro race, and a slave, her children were slaves. If no person could be legally held in slavery, but one who is a *fourth* negro, or whose mother was *fourth* negro, there are doubtless many slaves, who would be set at liberty.

The theory of *fourths* which runs through all four of the pro-

positions in question, is based upon a hypothesis not sustained by the law.

The *fifth proposition is* " that every *presumption,* consistent with *reason,* should be indulged in favor of freedom."

This may be true, but in a suit for freedom by a person held in slavery, it becomes a grave question as to what *presumptions* are *consistent* with *reason.* Inasmuch as the Court did not tell the jury what presumptions it considered consistent with reason, we think the proposition was too general and abstract to be of any practical legal advantage to the jury in arriving at a correct conclusion upon the issue before them. We have stated above what we deem to be the law of presumptions in suits for freedom.

The Court should have given the *first, second* and *third* instructions moved by the defendant. Certainly if Abby's mother was always held and treated as a slave, and was of negro extraction, and if Abby was so held, treated and acted, etc., as hypothetically assumed by the instructions, this was prima facie evidence that she and her children were slaves, unless they were emancipated.

The Court correctly refused the fifth instruction moved by the defendant, that: " All evidence on physiology was irrelevant, and not to be considered by the jury."

We presume this instruction was intended to apply to the testimony of the two physicians, who made statements in reference to the distinctive marks of the negro race.

If they were skilled in the natural history of the races of men, it was competent for them to state the distinguishing marks between the negro and the white race, to aid the jury, who had inspected the plaintiffs in Court, in coming to a correct conclusion as to whether they belonged to the one race, or the other.

The *sixth* instruction moved by the defendant was also properly refused by the Court, because it submitted to the jury the question whether the plaintiffs were legally held in slavery *in Alabama,* and made the issue turn upon that.

2 & 3. The second and third grounds of the motion for a new

trial, are that the verdict and judgment were contrary to law and evidence.

We do not propose to pass any opinion upon the weight of the testimony, this being a question for the jury. On the part of the defendant the testimony conduced to prove that the mother of Abby was regarded as a bright mulatto, and held, acted and treated as a slave for many years, perhaps during her whole life. That Abby, from her infancy, until about the year 1844, was likewise held, treated, and acted as a slave.

On the part of the plaintiffs the evidence conduces to prove that from about the year 1844, until a short time before the commencement of this suit, Abby, with her children, was permitted to live to herself, and act as a free woman, and that she and her children were treated in the neighborhood as white persons.

The declarations of the defendant also conduced to produce doubts as to whether she had any negro blood in her or not. There was no competent evidence that she or her children had been legally emancipated. *Jackson vs. Bob*, 18 *Ark.* The issue of slavery, as above remarked, turned upon the fact whether the plaintiffs belonged to the white or the negro race. The jury had the benefit of a personal inspection of the plaintiffs. What influence that had upon their verdict, we have no means of determining. If therefore the Court had not erred in its instructions to the jury, we should not, and could not, upon principle, disturb the verdict.

4th. There is nothing in the 4th ground for a new trial: that the Court excluded legal evidence.

The only evidence offered by the defendant, which was excluded by the Court, appears from the bill of exceptions to have been the will of Nathaniel Daniel, in which neither of the plaintiffs, nor Polly, the mother of Abby, seems to be mentioned; nor do we perceive that the contents of this will had any relevancy to the issue.

5th. The fifth ground is equally untenable. The plaintiffs, before they commenced suit, petitioned the Circuit Judge for

permission to sue as paupers, stating the grounds upon which they claimed to be free, and the judge made the orders directed by the statute in such case, and the plaintiffs brought their suit.

Afterwards the defendant filed in Court an answer to the petition, controverting the grounds upon which the plaintiffs claimed to be free. Upon the trial, it seems, the Court, upon the motion of the plaintiffs, struck the answer from the files. The defendant was not prejudiced by this. The law does not contemplate any answer to the petition in such case. The defendant could not have used his own answer as evidence on the trial, no more than the plaintiffs could have introduced their petition as such. The petition had accomplished its purpose when the judge made the orders prayed by it, and which were preliminary to the suit.

6th. The bill of exceptions shows that the jury were permitted to make a personal inspection of the plaintiffs in Court, for the purpose of aiding them in determining whether they belonged to the white or negro race, and perhaps, under the instructions of the Court, whether they were *one-fourth* negro, more or less. To which the defendant excepted, but he did not make this exception a ground of his motion for a new trial, and consequently waived it, if there was any thing in the objection.

For the errors above indicated, the judgment of the Court below is reversed, and the cause remanded, with instructions to the Court to grant the appellant a new trial.

Absent, Mr. Justice SCOTT.