[Civ. No. 13377. Second Dist., Div. Two. Dec. 2, 1941.]

Estate of ABAGAIL STARK, Deceased. WALTER V. BOWER et al., Appellants, v. GEORGE A. DOCK-WEILER, as Executor, etc., et al., Respondents.

Shaw, Bailey & Poe and Bailey & Poe for Appellants.

Joseph Musgrove, Thomas H. Cannan, Freston & Files, Sydney Wetzler, Paul E. Younkin, Dockweiler & Dockweiler and MacBeth & MacBeth for Respondents.

HANSON, J. *pro tem.*—This is an appeal by the contestants of the will of Abagail Stark from a judgment determining that they were not her heirs at law and as a consequence not entitled to maintain their contest against the validity of her will. The vital and only controlling question upon which our decision must turn is whether Abagail Stark was or was not the legitimate or legitimated child of Robert Stark. If she was his legitimate child, or a natural child legitimated either by his own public acts or conduct or by virtue of law, the decision below was erroneous; otherwise not.

The trial court found that while Abagail Stark was the issue of Robert Stark, a white man, and Catherine Stark, a mulatto, her parents had never married, and that Abagail had never been legitimated by any act of public acknowledgment by Robert Stark or by virtue of the provisions of any statute; and as a consequence the court held that the contestants, who are the descendants of Robert Stark by his marriage to Mary Virginia Elizabeth Stark, a white woman, were as a matter of law not Abagail Stark's heirs at law.

As the errors assigned deal wholly with the claim that the evidence was either contradictory to or insufficient to sustain the findings, we set forth only the competent evidence which favors the findings.

As has been indicated, Robert Stark originally married a white woman named Mary Virginia Elizabeth Stark, by whom he had four children. The contestants here are either children or grandchildren of these four children of Robert and Mary Stark. Mary Stark died some time prior to 1853, and thereafter Robert Stark, with his four children and his slave Catherine, emigrated by wagon train from his home in Kentucky to California, stopping seemingly for a short period, while on the way, in the State of Texas. Prior to the time Robert Stark left Kentucky he had a child by his slave Catherine, which died during infancy. In 1859, Catherine, while living with Robert Stark, gave birth to a second child. This was Abagail, whose will is here involved. In 1869 or 1870 Robert Stark, Catherine Stark and Abagail left Saugus, California, where Robert and Catherine Stark had resided since they came to California in 1853, and moved into a home in Los Angeles. It appears from the evidence that one Brophy held title to the Los Angeles property, and by his

deed, executed February 5, 1870, conveyed it to Catherine
Stark, and that thereafter Brophy resided on the Saugus
property where Robert, Catherine and Abagail Stark had
formerly lived. There is a want of testimony as to whether
Robert or Catherine, or both, had been the title holders of
the Saugus property.

There is no evidence in the record that Robert and
Catherine Stark ever went through any ceremony of mar-
riage. Neither is there any evidence of declaration or ad-
mission, direct or indirect, by either that they were ever
married, except that years after the death of Robert, when
Abagail made a quitclaim deed to her mother for the pur-
pose of removing any cloud on her mother's title to the Los
Angeles property, Catherine, over her signature by her mark,
certified that "the grantor in the foregoing deed named,
*viz.*, Abagail Stark, is the sole living issue of myself and
my deceased husband, Robert Stark." There was compe-
tent testimony of declarations made by both Catherine and
her daughter Abagail, after the death of Robert Stark, that
Catherine was never married. Likewise, declarations were
shown to have been made by Catherine that she was "of
the Indian and negro races" and that Abagail "could not
marry a colored man because she had so much more white
than colored blood." Moreover, it was shown that Abagail
had declared that she was of the "negro race"; and that
she had "some negro blood"; that her mother had been a
"negro slave." Additional testimony bearing on the fact
that Catherine was a negro or mulatto is the testimony that
she had declared she had no living relations. There was
no testimony as to the percentage of negro blood that flowed
in the veins of Catherine or Abagail.

The only evidence in the record which affirmatively indi-
cates that Robert Stark was a white man were the declara-
tions of Abagail to that effect. No issue was made in the
trial below that he was not white; the issue there on the
question of race being only as to whether Catherine and
Abagail were white persons.

The only evidence that bore on the question of legitimacy
of Abagail by reason of any acts or conduct by Robert Stark,
other than the fact that she lived from the time she was
born until the death of Robert Stark with him and her
mother, is the testimony of a single witness that on some
three or four occasions after their removal to Los Angeles

she saw Catherine and Abagail riding with Stark in a buck-board, and that on one of these occasions they were driving to the home of one of Stark's daughters in the neighborhood of Saugus.

Under their first specification of error appellants contend that six rulings by the court on evidence were erroneous. For failure to comply with our rules the appellants are not entitled to a review of the alleged errors. Nevertheless we have examined the rulings and we find that all of them are indubitably correct. ▮ With respect to the ruling on appellants' offer of proof we should perhaps say a word to clear up what seems to be a rather too general misap-prehension as to the function of an offer of proof. Counsel for appellants sought to have a witness read data from a record, which was not an original record. Objection having been properly sustained on the ground the record was sec-ondary, counsel made an offer to prove *by the witness* some half dozen or more separate matters embodied in the written record. If counsel intended by his offer to prove these sev-eral matters by having the witness read them from the secondary record, the ruling was obviously correct. If, how-ever, he intended to prove by the witness these various mat-ters through the personal knowledge of the witness, without reference to the record, he did not by the offer of proof achieve error in the ruling on the offer. The proper pro-cedure in that situation would have been for counsel to propound the pertinent questions to the witness. He was not entitled to use an offer of proof, as a dragnet, to obvi-ate asking the witness the particular questions to which he desired answers from the witness's own personal knowledge. Accordingly, even though the witness could have testified as of his own knowledge to every fact set forth on the sec-ondary record, counsel foreclosed himself by his offer to prove, when instead he should have asked direct questions of the witness. (See *Indianapolis etc.* v. *Hall,* 165 Ind. 557 [76 N. E. 242].)

Contestants concede that the evidence established that Catherine Stark "had some colored blood," but they con-tend that there was no evidence to indicate that she had a sufficient percentage of negro blood so as to require that she be classified as a negro or mulatto. Accordingly, they con-tend that the statute of this state, which was in force from

the time that Robert Stark arrived here in 1853 until his death in 1870, did not prohibit a marriage between him and Catherine; and, even if it did, they claim there was a valid common law marriage on the facts, because by our statute (Code Civ. Proc., sec. 1963, subd. 30) there is a presumption (disputable) "That a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage." Before proceeding to a discussion of these contentions it is important to observe that if any marriage by common law, or otherwise, actually took place it occurred in Kentucky, Texas or California. If by chance it occurred in some other state the point is of no materiality, as every state of the Union at the time prohibited a marriage between a white and a mulatto having one-eighth or more negro blood. As the laws of the states other than California were no more favorable, if as favorable, to the position of the contestants, we shall limit our discussion to the law of this state.

The controlling California statute (Statutes of 1849–1850, chapter 140), enacted by the legislature in April, 1850 (now, with additions, Civ. Code, sec. 60), reads as follows: "All marriages of white persons and negroes or mulattoes are declared to be illegal and void." While this statute did not define a "mulatto," two other statutes enacted at the same time, which prohibited a "black or mulatto" from testifying for or against a white person, or in a case where a white person was a party, defined a "mulatto" as a person having "one-eighth part or more of negro blood." (Statutes of California, 1849–1850, chapter 99, sec. 14; chapter 142, sec. 306.) These are statutes *in pari materia,* to be read and considered together. So read and construed it is plain that under the statute a marriage between a white person and a mulatto having one-eighth part or more of negro blood was illegal and void. Whether, as has been held (*Daniel* v. *Guy,* 19 Ark. 121; *State* v. *Hayes,* 1 Bailey [S. C.] 275; cf. *People* v. *Hall,* 4 Cal. 399), a marriage between a white person and a person with less than one-eighth part of negro blood may be classed as illegal and void on the theory that such person is a "mulatto" within the meaning of our statute (now Civ. Code, sec. 60), we are not, in view of the facts of this case, required to decide.

Our statute, which expressly declares marriages of the kind mentioned therein as being illegal and void, may

not be interpreted to mean marriage by solemnization only, as it is not so limited. As marriage by consent only, usually denominated common law marriage, was permissible in California during the period here involved, such marriages must be deemed within the bar of the statute. That being true, it follows that the disputable presumption "that a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage," being disputed by the substantive law itself, may not be invoked to operate as a presumption if one of the parties is in fact a mulatto. (Cf. *Estate of Baldwin,* 162 Cal. 471, 472 [123 Pac. 267]. See *Estate of Morgan,* 203 Cal. 569, 575 [265 Pac. 241]; *Estate of Elliott,* 165 Cal. 339, 343 [132 Pac. 439].)

Contestants further contend that if in fact there was a marriage which was illegal and void because Catherine was a mulatto, Abagail was nevertheless legitimated under Civil Code, section 85, reading: "The issue of a marriage which is void or annulled or dissolved by divorce is legitimate"; and, moreover, they contend that Robert Stark so publicly acknowledged Abagail as his child that he legitimated her by the rule laid down in Civil Code, section 230. The answer to this contention, we think, is to be found in two decisions of our Supreme Court. In *Estate of Shipp,* 168 Cal. 640 [144 Pac. 143], the court in stating that while the statutes of this state since 1895 require a solemnization as an essential to a valid marriage, a child of such a marriage is by Civil Code, section 230, legitimate even though no marriage license was procured. In so holding the court construed the language of the then statute reading: "The issue of all marriages null in law . . . are legitimate" (Civ. Code, sec. 1387) as not being limited to marriages that might be annulled under the provisions of Civil Code, section 82. However, it went on to say: "There may be some question whether the enactment [legitimizing children of marriages null in law] applies to the offspring of marriages which are declared by the code to be 'illegal and void,' or 'void from the beginning,' such as incestuous marriages (sec. 59), marriages of whites with negroes (sec. 60), or (under certain conditions) marriages between persons one of whom is already married. (Sec. 61.)" In *Estate of Gregorson,* 160 Cal. 21 [116 Pac. 60, Ann. Cas. 1912D, 1124 L. R. A. 1916C, 697, the Supreme Court held there could

be no collateral attack, by third parties, on a marriage which it was claimed was an absolute nullity, because one of the parties was of unsound mind. In so holding the court, in its analysis of the pertinent statutes, said there was a clear distinction drawn by the legislature between void marriages and marriages which might be annulled. It pointed out that while certain marriages, such as marriages of white persons with negroes or mulattoes, were illegal and void, and, by Civil Code, section 80, either party thereto could proceed by action to have the same *so declared,* yet that marriages which might be annulled, by Civil Code, section 82, did not include the so-called void marriages, such as one between a white person and a negro or mulatto, or any of the group of void marriages except in one instance—that of a marriage contracted by a person during the life of a former husband or wife. The reason for including the latter, it was pointed out, was due to the fact that by Civil Code, section 61, they were not in all cases void.

The two cited cases, even though they do not squarely decide the question before us, as the particular issue which we have here was not there involved, are nevertheless sign-posts that leave no doubt as to the decision which must be here made. Accordingly we must, and do, hold that the statute applicable at the time here in question (Civil Code, section 1387, now section 85 with some change of verbiage), reading, "the issue of all marriages null in law . . . are legitimate," did not at or prior to the time of the death of Robert Stark embrace children of an illegal and void marriage, such as a marriage between a white and negro or mulatto.

 As this holding is clearly required to effectuate the policy laid down by our legislature in the period 1849 to 1870, it would seem to follow that we would not give effect to that policy if we were to hold that under chapter 385, section 9, Statutes of California, 1869–1870 (with variations now Civil Code, section 230), a white person could by public acknowledgment legitimate his or her natural child by a negro or mulatto. However, we are not required to decide this point, as the evidence was wholly insufficient to meet the requirements of that statute. The only evidence bearing at all on the question whether Robert Stark legitimated his natural child, if he could, comes from a single witness who testified that when she was a child of 14 years of age she saw, on some three or four occasions in 1869 or 1870, Robert

Stark· driving a buckboard accompanied by Catherine and Abagail, and that on one of these occasions he was driving from Los Angeles to the home of one of his daughters living near Saugus. This, under the decisions, falls far short of being a public acknowledgment and recognition of Abagail as his legitimate child. The claim is not aided by the fact that Abagail lived in the household where her mother lived both prior and subsequent to her birth. The witness was 84 when she testified. As there was evidence that Abagail had declared, when she came to make her will, that she had no living relatives, the trial court was justified in crediting the declaration of Abagail and disbelieving the witness. At all events, the testimony was not of a character sufficient to upset the trial court's finding that there had been no public acknowledgment by Robert Stark of the legitimacy of Abagail.

Before proceeding to apply the controlling legal principles to the facts of this case it is necessary to discuss the earnest contention of contestants that the burden of proof as to the invalidity of the alleged marriage between Robert Stark and Catherine Stark rests with the proponents of the will rather than with the contestants. The contention is clearly without merit. Our Probate Code provides that only "a person interested" in the will may contest it. (Probate Code, sec. 370.) Among those who are classed as being "persons interested" are the heirs at law. (*Estate of Land,* 166 Cal. 538, 540 [137 Pac. 246].) If a person claims that he is an "heir at law" and so entitled to contest the will before probate, he is required to file written grounds of opposition. (Probate Code, sec. 370.) Having filed such grounds he is on the trial, by virtue of the provisions of the statute, classed as being a plaintiff and the petitioner as the defendant. (Probate Code, sec. 371.) If an issue is made as to the right of the objector as plaintiff to contest the will, that question, on issue joined, is to be determined by the court before the issue as to the validity is tried before a jury, where a jury has been demanded. (*Estate of Land,* *supra.*) On such a trial to the court, involving only the right of the plaintiff, as an "interested party" under the statute, to contest the validity of the will, the burden of proof is upon such plaintiff, as in every case where one is a plaintiff, to prove by a preponderance of the evidence that he has

the interest requisite under the statute to maintain the contest. (18 C. J. 872, sec. 126. See also 38 C. J. 1321.) That being true, it follows as a matter of course that the burden of proof rests upon him to prove, by a preponderance of the evidence, that he has the status of an "interested person" as that phrase is defined by the statute and the decisions. If the plaintiff by a preponderance of the evidence—of which he has the burden of proof—proves that he is an heir at law (if that be the issue), then he is entitled to contest; otherwise not. ■ Whether one is an heir at law depends not on the sections of the Probate Code alone but upon all the statutes of the state that bear on the subject. Of necessity, then, the provisions of any statutes that deal with the substantive law of heirship must be met. ■ In short, if a *prima facie* case is made by plaintiff upon all the essential allegations necessary to state a cause of action, a case is nevertheless not made if evidence comes in, voluntarily or involuntarily, while plaintiff is putting on his case, which is sufficient to divest the plaintiff of a right to judgment. (64 C. J. 474, note 17.)

One of the most familiar examples of this rule comes from negligence cases. Under the law of this state a plaintiff who alleges that the defendant was negligent, and proves the fact by a preponderance of the evidence, is entitled to have a jury pass on his case without alleging or proving his want of contributory negligence. In short, if he makes a *prima facie* case on his claim of defendant's negligence a nonsuit may not be granted against him. But if it be shown, on his own case, that as a matter of law he was contributorily negligent, then a nonsuit must be directed against him, upon motion therefor, even though he was not required to negative by his pleading his freedom from contributory negligence nor to adduce evidence on the point. (*Elliott* v. *Chicago etc. Ry. Co.*, 150 U. S. 245 [14 Sup. Ct. 85, 37 L. Ed. 1068].) ■ So here it would seem it was not necessary, in the first instance, for the plaintiff to have averred and proved that the parties had the capacity to contract the marriage which they claim took place between Robert Stark and Catherine Stark. (38 C. J. 1326, note 74.) So, too, apparently it would have been sufficient for them to have proved facts indicating a common law marriage, without introducing any evidence as to whether one was a negro or mulatto and the other a white, or that both were white, or both were negroes

or mulattoes. But the moment that it appeared on their case, as it did, that one of the parties to the alleged marriage was a white and that the other had negro or mulatto blood, that evidence, regardless of the pleadings or the *prima facie* case made on the pleadings, increased their burden of proof, by virtue of substantive law, to show by competent evidence, before they could be entitled to a judgment, either that both the parties were mulattoes or negroes or one a mulatto and the other a negro, under the provisions of the substantive statutes applicable, or that both were under those statutes white. As appellants concede, there is no evidence that Catherine had less than one-eighth negro blood, they must fail because the burden was on them to prove she was not in the prohibited class. In short, on their own case evidence came in without objection that Catherine had some negro blood in her veins. That being true, it was for the plaintiffs, where they claimed, as they did below, that Robert Stark was white, to prove by a preponderance of the evidence that Catherine was not a mulatto within the purview of the statutes of this state which were in effect at the time of the claimed marriage. As this was not shown, the burden was not met. The statute, as has been seen, not only prohibited the marriage of a mulatto and a white, but it made such marriage illegal and void. Whether the marriage was ceremonial or by way of consent, so as normally to give rise to a common law marriage, is immaterial. Both types of marriage were interdicted by the statute, and hence on the evidence there could be no valid marriage. If there was the semblance of a marriage—no matter how achieved—it was under the statute for all intents and purposes illegal and void.

The plaintiffs then having failed—they having the burden of proof—to prove a marriage valid under the statute, they have failed to prove that Abagail as a matter of law was legitimated, for the simple reason that the statute applies only to the issue of those who would, as we have already pointed out, have the *capacity* to marry under the law.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 29, 1942.