*THE PEOPLE, RESPONDENT, *v.* GEORGE W. [399] HALL, APPELLANT.

WITNESS—PERSONS INCOMPETENT.—Section 394 of the Civil Practice Act provides: "No Indian or Negro shall be allowed to testify as a witness in any action in which a white person is a party."

IDEM. –Section 14 of the Criminal Act provides: "No Black, or Mulatto person, or Indian shall be allowed to give evidence in favor of, or against a White man." *Held,* that the words, Indian, Negro, Black and White, are generic terms, designating race. That, therefore, Chinese and all other peoples not white, are included in the prohibition from being witnesses against Whites.

Mr. Ch. J. MURRAY delivered the opinion of the Court. Mr. J. HEYDENFELDT concurred.

The appellant, a free white citizen of this State, was convicted of murder upon the testimony of Chinese witnesses.

The point involved in this case, is the admissibility of such evidence.

The 394th section of the Act Concerning Civil Cases, provides that no Indian or Negro shall be allowed to testify as a witness in any action or proceeding in which a White person is a party.

The 14th section of the Act of April 16th, 1850, regulating Criminal Proceedings, provides that "No Black or Mulatto person, or Indian, shall be allowed to give evidence in favor of, or against a white man."

The true point at which we are anxious to arrive is, the legal signification of the words, " Black, Mulatto, Indian and White person," and whether the Legislature adopted them as generic terms, or intended to limit their application to specific types of the human species.

Before considering this question, it is proper to remark the difference between the two sections of our statute, already

---

[1] Cited in *Speer* v. *See Yup Co.*, 13 Cal. 73; *People* v. *Elyea*, 14 Cal. 146. See *People* v. *Washington*, 36 Cal. 658; *People* v. *Brady*, 40 Cal. 198; *People* v. *McGuire*, 45 Cal. 56. See 8 Ind. 17.

quoted, the latter being more broad and comprehensive in its exclusion, by use of the word "Black," instead of Negro.

[400]     * Conceding, however, for the present, that the word "Black," as used in the 14th section, and " Negro," in 394th, are convertible terms, and that the former was intended to include the latter, let us proceed to inquire who are excluded from testifying as witnesses under the term " Indian."

When Columbus first landed upon the shores of this continent, in his attempt to discover a western passage to the Indies, he imagined that he had accomplished the object of his expedition, and that the Island of San Salvador was one of those Islands of the Chinese Sea, lying near the extremity of India, which had been described by navigators.

Acting upon this hypothesis, and also perhaps from the similarity of features and physical conformation, he gave to the Islanders the name of Indians, which appellation was universally adopted, and extended to the aboriginals of the New World, as well as of Asia.

From that time, down to a very recent period, the American Indians and the Mongolian, or Asiatic, were regarded as the same type of the human species.

In order to arrive at a correct understanding of the intention of our Legislature, it will be necessary to go back to the early history of legislation on this subject, our statute being only a transcript of those of older States.

At the period from which this legislation dates, those portions of Asia which include India proper, the Eastern Archipelago, and the countries washed by the Chinese waters, as far as then known, were denominated the Indies, from which the inhabitants had derived the generic name of Indians.

Ethnology, at that time, was unknown as a distinct science, or if known, had not reached that high point of perfection which it has since attained by the scientific inquiries and discoveries of the master minds of the last half century. Few speculations had been made with regard to the moral or physical differences between the different races of mankind. These were general in their character, and

limited to those visible and palpable variations which could not escape the attention of the most common observer.

The general, or perhaps universal opinion of that day was, * that there were but three distinct types of [401] the human species, which, in their turn, were subdivided into varieties of tribes. This opinion is still held by many scientific writers, and is supported by Cuvier, one of the most eminent naturalists of modern times.

Many ingenious speculations have been resorted to for the purpose of sustaining this opinion. It has been supposed, and not without plausibility, that this continent was first peopled by Asiatics, who crossed Behring's Straits, and from thence found their way down to the more fruitful climates of Mexico and South America. Almost every tribe has some tradition of coming from the North, and many of them, that their ancestors came from some remote country beyond the ocean.

From the eastern portions of Kamtschatka, the Aleutian Islands form a long and continuous group, extending eastward to that portion of the North American Continent inhabited by the Esquimaux. They appear to be a continuation of the lofty volcanic ranges which traverse the two continents, and are inhabited by a race who resemble, in a remarkable degree, in language and appearance, both the inhabitants of Kamtschatka (who are admitted to be of the Mongolian type), and the Esquimaux, who again, in turn, resemble other tribes of American Indians. The similarity of the skull and pelvis, and the general configuration of the two races; the remarkable resemblance in eyes, beard, hair, and other peculiarities, together with the contiguity of the two continents, might well have led to the belief that this country was first peopled by the Asiatics, and that the difference between the different tribes and the parent stock was such as would necessarily arise from the circumstances of climate, pursuits, and other physical causes, and was no greater than that existing between the Arab and the European, both of whom were supposed to belong to the Caucasian race.

Although the discoveries of eminent archeologists, and

the researches of modern geologists, have given to this continent an antiquity of thousands of years anterior to the evidence of man's existence, and the light of modern science may have shown conclusively that it was not [402 peopled by the inhabitants * of Asia, but that the Aborigines are a distinct type, and as such claim a distinct origin, still, this would not in 'any degree, alter the meaning of the term, and render that specific which was before generic.

We have adverted to these speculations for the purpose of showing that the name of Indian, from the time of Columbus to the present day, has been used to designate, not alone the North American Indian, but the whole of the Mongolian race, and that the name, though first applied probably through mistake, was afterwards continued as appropriate on account of the supposed common origin.

That this was the common opinion in the early history of American legislation, cannot be disputed, and, therefore, all legislation upon the subject must have borne relation to that opinion.

Can, then, the use of the word "Indian," because at the present day it may be sometimes regarded as a specific, and not as a generic term, alter this conclusion? We think not; because at the origin of the legislation we are considering, it was used and admitted in its common and ordinary acceptation, as a generic term, distinguishing the great Mongolian race, and as such, its meaning then became fixed by law, and in construing statutes the legal meaning of words must be preserved.

Again: the words of the Act must be construed in *pari materia.* It will not be disputed that "White" and "Negro" are generic terms, and refer to two of the great types of mankind. If these, as well as the word "Indian," are not to be regarded as generic terms, including the two great races which they were intended to designate, but only specific, and applying to those whites and Negroes who were inhabitants of this continent at the time of the passage of the Act, the most anomalous consequences would ensue. The European white man who comes here would not be

shielded from the testimony of the degraded and demoralized caste, while the Negro, fresh from the coast of Africa, or the Indian of Patagonia, the Kanaka, South Sea Islander, or New Hollander, would be admitted, upon their arrival, to testify against white citizens in our courts of law.

* To argue such a proposition would be an insult [403] to the good sense of the Legislature.

The evident intention of the Act was to throw around the citizen a protection for life and property, which could only be secured by removing him above the corrupting influences of degraded castes.

It can hardly be supposed that any Legislature would attempt this by excluding domestic negroes and Indians, who not unfrequently have correct notions of their obligations to society, and turning loose upon the community the more degraded tribes of the same species, who have nothing in common with us, in language, country or laws.

We have, thus far, considered this subject on the hypothesis that the 14th section of the Act Regulating Criminal Proceedings and the 394th section of the Practice Act, were the same.

As before remarked, there is a wide difference between the two. The word " black " may include all negroes, but the term "negro" does not include all black persons.

By the use of this term in this connection, we understand it to mean the opposite of "white," and that it should be taken as contradistinguished from all white persons.

In using the words " no black or mulatto person, or Indian shall be allowed to give evidence for or against a white person," the Legislature, if any intention can be ascribed to it, adopted the most comprehensive terms to embrace every known class or shade of color, as the apparent design was to protect the white person from the influence of all testimony other than that of persons of the same caste. The use of these terms must, by every sound rule of construction, exclude every one who is not of white blood.

The Act of Congress, in defining what description of aliens may become naturalized citizens, provides that every "free white citizen," etc., etc. In speaking of this subject,

Chancellor Kent says that "the Act confines the description to 'white' citizens, and that it is a matter of doubt, whether, under this provision, any of the tawny races of Asia can be admitted to citizenship." (2 Kent's Com. 72.)

[404]     We are not disposed to leave this question in any doubt. The word "white" has a distinct signification, which *ex vi termini*, excludes black, yellow, and all other colors. It will be observed, by reference to the first section of the second Article of the Constitution of this State, that none but white males can become electors, except in the case of Indians, who may be admitted by special Act of the Legislature. On examination of the constitutional debates, it will be found that not a little difficulty existed in selecting these precise words, which were finally agreed upon as the most comprehensive that could be suggested to exclude all inferior races.

If the term "white," as used in the Constitution, was not understood in its generic sense as including the Caucasian race, and necessarily excluding all others, where was the necessity of providing for the admission of Indians to the privilege of voting, by special legislation?

We are of the opinion that the words "white," "negro," "mullatto," "Indian," and "black person," wherever they occur in our Constitution and laws, must be taken in their generic sense, and that, even admitting the Indian of this continent is not of the Mongolian type, that the words "black person," in the 14th section, must be taken as contradistinguished from white, and necessarily excludes all races other than the Caucasian.

We have carefully considered all the consequences resulting from a different rule of construction, and are satisfied that even in a doubtful case, we would be impelled to this decision on grounds of public policy.

The same rule which would admit them to testify, would admit them to all the equal rights of citizenship, and we might soon see them at the polls, in the jury box, upon the bench, and in our legislative halls.

This is not a speculation which exists in the excited and over-heated imagination of the patriot and statesman, but it is an actual and present danger.

The anomalous spectacle of a distinct people, living in our community, recognizing no laws of this State, except through necessity, bringing with them their prejudices and national feuds, in which they indulge in open violation of law; *whose mendacity is proverbial; a race of   [405] people whom nature has marked as inferior, and who are incapable of progress or intellectual development beyond a certain point, as their history has shown; differing in language, opinions, color, and physical conformation; between whom and ourselves nature has placed an impassable difference, is now presented, and for them is claimed, not only the right to swear away the life of a citizen, but the further privilege of participating with us in administering the affairs of our Government.

These facts were before the Legislature that framed this Act, and have been known as matters of public history to every subsequent Legislature.

There can be no doubt as to the intention of the Legislature, and that if it had ever been anticipated that this class of people were not embraced in the prohibition, then such specific words would have been employed as would have put the matter beyond any possible controversy.

For these reasons, we are of opinion that the testimony was inadmissible.

The judgment is reversed and the cause remanded.

Mr. Justice WELLS dissented, as follows:

From the opinion of the Chief Justice, I most respectfully dissent.