[Civ. No. 27491. Second Dist., Div. One. Sept. 11, 1963.]

DON WILSON BUILDERS et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; THE PEOPLE, Real Party in Interest.

Thomas C. Webster and Clement H. Jacomini for Petitioners.

No appearance for Respondent.

Stanley Mosk, Attorney General, Dan Kaufmann, Assistant Attorney General, Charles B. McKesson and Robert E. Burke, Deputy Attorneys General, for Real Party in Interest.

WOOD, P. J.—This is a proceeding in prohibition to restrain the superior court from proceeding further in an action for injunctive relief.

The action was commenced by the Attorney General in the name and on behalf of the People of the State of California, and seeks to enjoin the defendants from alleged violations of the Unruh Civil Rights Act (Civ. Code, § 51). Defendants are Don Wilson Builders, a corporation, Southwood Construction Company, a corporation, and officers, directors, agents, employees, and licensees of said corporate defendants. The complaint therein alleges in substance as follows: The defendants are and at all relevant times were the builders, owners, subdividers, sellers, and promoters of a housing tract known as Dominguez Hills in Los Angeles County. During a period of at least two years preceding the filing of this complaint, the defendants have sold and are now selling houses in said tract to the public. During said time, defendants have unlawfully denied the full and equal accommodations, advantages, facilities, privileges and services of their business establishment to Negroes, on the grounds of race or color, in that defendants have refused to sell, and have refused to offer to sell any of the houses to Negroes; defendants have refused to accept from Negroes applications and deposits relating to the purchase of said houses; and defendants have refused to enter into any sales discussion with a view to the possible sale of any of the houses to Negroes, all on the basis of race or color.

Six specific instances of the foregoing acts are then alleged. Then the complaint alleges: ''Defendants' discrim-

inatory practice of refusing to sell or deal with prospective purchasers solely because said purchasers are Negroes is injurious to the health, safety, and welfare of the People of the State of California in that it creates and perpetuates segregated and inadequate housing for Negroes; creates and perpetuates de facto segregation in public schools, churches, hospitals, places of public accommodation, recreational facilities, and welfare and civic activities; deprives substantial numbers of persons within this state of rights guaranteed to them by the Constitution and laws of the State of California; and contributes to disease, crime and immorality.''

Plaintiff seeks an order enjoining defendants from refusing to sell houses on grounds of race, color, or religion; refusing to accept applications to purchase houses from prospective purchasers on grounds of race, color, or religion; refusing to enter into any sales discussion with a view to the possible sale of any house on grounds of race, color, or religion.

Defendants demurred to the complaint and moved for dismissal of the action on the ground (among others) that the Attorney General had no legal standing to complain of the conduct alleged in the complaint. These matters were heard on April 16, 1963, at the same time as a hearing in response to an order to show cause for an injunction pendente lite. After argument and presentation of points and authorities, the trial court continued the matter for the submission of additional authorities. Prior to those hearings, upon application of the People, the court issued a temporary restraining order which, as amended, is similar to the injunction sought.

At the conclusion of the hearings, the court announced that the preliminary injunction would be granted as prayed by plaintiff, and defendants instituted this proceeding in prohibition, praying that a writ issue restraining the entry of an order pursuant to such announcement, and restraining further proceedings in the action other than to dismiss it.

The sole question raised by the petition is whether the People of the State of California, acting through the Attorney General, have authority to maintain this civil action to restrain violations of section 51 of the Civil Code.

Petitioners contend that the powers of the Attorney General, though broad, are not without limitation; that the Attorney General ''represents the interests of the People in matters of public concern only, and that he may not maintain

an action solely for the vindication of private rights or the redress of private grievances''; that section 51 of the Civil Code upon which this action is based creates purely personal and private rights only, and it ''does not purport to create rights of general public concern, nor does it purport to place any duty upon the Attorney General nor to empower him with any right to bring any action in his official capacity based upon an alleged violation of the rights therein created.''

The People contend that ''the rights and interests sought to be vindicated by this action are incontrovertibly of a public nature, justifying the state in its representative capacity in seeking the relief for which the complaint herein prays.''

Section 51 of the Civil Code provides: ''This section shall be known, and may be cited, as the Unruh Civil Rights Act. All persons within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

''This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every color, race, religion, ancestry, or national origin.''

Section 52 of the Civil Code provides: ''Whoever denies, or who aids, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of color, race, religion, ancestry, or national origin, contrary to the provisions of section 51 of this code, is liable for each and every such offense for the actual damages, and two hundred fifty dollars ($250) in addition thereto, suffered by any person denied the rights provided in section 51 of this code.''

In the case of *Burks* v. *Poppy Constr. Co.*, 57 Cal.2d 463 [20 Cal.Rptr. 609, 370 P.2d 313], the plaintiffs, husband and wife, who were Negroes, sought damages and injunctive relief, under the Unruh Act, alleging discrimination with respect to the sale of a house in a tract. A demurrer to the first cause of action therein (based on the Unruh Act) was sustained without leave to amend, and judgment of dismissal was entered. On appeal therein the judgment was reversed, and it was said (p. 469) : ''It is clear that defendants operated 'business establishments' within the meaning of the term as used in the Unruh Act.'' At page 470 it was said ''[A] person whose civil rights are invaded as a result of dis-

crimination against a group on the basis of race or ancestry may bring an action for injunctive relief on behalf of all members of the group similarly situated.'' At page 471 the court further said: ''Discrimination on the basis of race or color is contrary to the public policy of the United States and of this state.'' Also on page 471 it was said: ''Discrimination in housing leads to lack of adequate housing for minority groups [citation], and inadequate housing conditions contribute to disease, crime, and immorality. Under the police power reasonable restrictions may be placed upon the conduct of any business and the use of any property [citations], and the restriction here imposed in furtherance of the policy against discrimination is reasonable.''

In *People* v. *Centr-O-Mart*, 34 Cal.2d 702 [214 P.2d 378], a district attorney began a civil action in the name of ''The People of the State of California'' to enjoin alleged violations of the Unfair Practices Act (Bus. & Prof. Code, §§ 17000-17101). The defendants therein demurred and moved to dismiss the complaint upon the ground that the state was not a proper party. The demurrer was sustained without leave to amend and judgment of dismissal was entered. The question presented therein was whether the state, because not expressly included within the list of those who might bring such actions, was excluded by implication. It was held that the state was not excluded, and the judgment was reversed. It was said therein (p. 704): ''Where a statute is not expressly made applicable to government, it is for the courts to determine whether the Legislature intended it to apply to government. In making that determination, it is proper to consider all matters which, under the rule of statutory interpretation, shed light on the legislative intention. . . . The Legislature here has specifically declared that the purpose of the act is to 'safeguard the public.' It would appear that the state, acting through its law enforcement officers, is a proper party plaintiff to bring suit for that purpose, and that the Legislature did not intend to exclude it by implication.''

In *Pierce* v. *Superior Court*, 1 Cal.2d 759 [37 P.2d 453, 460, 96 A.L.R. 1020], it was held that the Attorney General, as the chief law officer of the state, had broad powers derived from the common law, and in the absence of any legislative restriction, had the power to file any civil action or proceeding directly involving the rights and interests of the state, or which he deemed necessary for the enforcement of

the law of the state, the preservation of order, and the protection of public rights and interests. It was said therein at pages 761 and 762 that Political Code, section 1109, was not "to be construed as a restriction upon the broad powers of the attorney-general. The fact that a remedy is given to a private individual to institute such an action could not operate to deny the power of the attorney-general to bring a similar action on behalf of the state, which power exists independent of said section."

It thus appears from the above cited cases that the Supreme Court of this state has decided that persons who are engaged in the business of building and selling houses in a tract are operating "business establishments" within the meaning of the Unruh Act; that injunctive relief as well as damages may be available under that act; an action for injunctive relief, under the act, may be brought by a person on behalf of all persons similarly situated; discrimination on the basis of race or color is contrary to the public policy of the state; discrimination in housing leads to inadequate housing conditions which contribute to disease, crime, and immorality; that the restriction imposed under the act in furtherance of the policy against discrimination is reasonable; and that the Attorney General, as the chief law officer of the state, has broad powers derived from the common law.

In the present case, in view of the pronouncements of the Supreme Court, it appears that the allegations of the complaint herein were sufficient to show that defendants, as builders and sellers of houses in a housing tract, were operating a business establishment within the meaning of the Unruh Act. As above shown, other allegations of the complaint were to the effect that in the matter of selling such houses the defendants discriminated against Negroes by refusing to sell to them, and that such discrimination is injurious to the health, safety, and welfare of the People of the state. As above stated, the defendants demurred to the complaint and thereby presented the issue as to whether (even if it be assumed that such allegations are true) the Attorney General was entitled to bring the action in the name of the People. By reason of the demurrer, the allegations of the complaint are assumed to be true, merely for the purpose of testing the legal sufficiency of the complaint. The proceeding in this court is not for the purpose of determining whether, as a matter of fact, there was discrimination, but it is only for the purpose of determining whether, if it be assumed that the alleged facts are

true, the Attorney General was entitled, on the basis of such assumed facts, to bring this action.

In *People* v. *Centr-O-Mart, supra,* the Supreme Court held that a district attorney was authorized to bring an action in the name of the People for injunctive relief for violations of the Unfair Practices Act, even though that act did not expressly authorize such an action to be brought in the name of the People. The purpose of that act, as stated therein, is to "safeguard the public" against monopolies and business practices by which fair competition is destroyed or prevented.

The purpose of the Unruh Act, involved in the present case, is to prevent discrimination in business establishments on account of race or color. That act does not expressly provide that a purpose thereof is to safeguard the public against such discrimination, but in the *Burks* case, *supra,* it was said that discrimination on the basis of race or color is contrary to the public policy of the state. In the *Burks* case it was also held that discrimination, prohibited under the Unruh Act, contributed to disease, crime, and immorality. Furthermore, in the present case, the complaint alleged that the asserted discrimination was injurious to the health, safety, and welfare of the People of the state. The Unruh Act does not expressly authorize such an action to be brought in the name of the People, but it would seem that the reason for authorizing an action in the name of the People for injunctive relief under the Unfair Practices Act would be applicable in an action for injunctive relief under the Unruh Act.

In view of the Supreme Court cases above cited, involving situations substantially analogous to the situation in the present case, it is concluded that the contention of the Attorney General (relative to maintaining the action) should be sustained.

The petition for a writ of prohibition is denied. The alternative writ of prohibition is discharged.

Lillie, J., concurred.

FOURT, J.—I dissent:

Petitioners herein have applied for a writ of prohibition, the effect of which if granted will be to stop the Superior Court in Los Angeles County from proceeding with an action in injunction brought by the Attorney General in the name of the People of the State of California for alleged violations

of the provisions of Civil Code, sections 51 and 52 (known as the Unruh Civil Rights Act).

On March 11, 1963, in Los Angeles County the Attorney General, an assistant attorney general and two deputy attorneys general, as the attorneys for the State of California, filed a complaint for an injunction against Don Wilson Builders, a corporation, et al. It was alleged therein among other things that the defendants (the petitioners herein) were engaged in the business of building and selling housing accommodations in a tract known as Dominguez Hills near 190th Street and Avalon Boulevard; that for at least two years the defendants had sold and attempted to sell to the public and are now selling to the public houses in the named tract; that the defendant subdividers have denied the full and equal accommodations of their business to Negroes on the basis of race or color in that they have refused to offer to sell any of the houses in the named tract to Negroes, have refused to accept applications and deposits with reference to such houses from Negroes, have refused to enter into sales discussions with a view to possible sales of such houses to Negroes. There then follow six specifically named instances of failure to sell to Negroes, starting with September 18, 1960, and ending December 27, 1962; a statement is set forth that such practice is "injurious to the health, safety and welfare of the People of the State of California, in that it creates and perpetuates segregated and inadequate housing for Negroes; creates and perpetuates de facto segregation in public schools, churches, hospitals, places of public accommodation, recreational facilities, and welfare and civic activities; deprives substantial numbers of persons within this state of rights guaranteed to them by the Constitution and laws of the State of California; and contributes to disease, crime, and immorality," that further *the plaintiff through the Attorney General has requested the subdividers to desist their unlawful acts* but they threaten to continue such acts, that it is impossible to ascertain the damages which the state will sustain if the subdividers are not enjoined. There then follows a prayer for a preliminary injunction, for an order to show cause why a preliminary injunction should not issue and upon a final hearing why such injunction should not be made permanent. The subdividers were sought to be enjoined from: (1) refusing to sell houses on grounds of race, color, religion, ancestry or national origin, (2) refusing to accept applications to purchase a house on the grounds above stated and

(3) refusing to enter any sales discussion with a view to the possible sale of any house upon the grounds heretofore set forth.

An order to show cause was issued on March 11, 1963, directing the subdividers to show cause at a time certain in court why they should not be restrained as above indicated. A demurrer to the complaint was filed by the subdividers on March 27, 1963, and at the same time a notice of motion to dismiss was filed, the latter being upon the grounds that the Attorney General has no standing to institute the action. Opposition to the order to show cause was also filed on the same date. Attached to such opposition documents was an affidavit of Don Wilson (one of the defendants and an officer in each of the corporate defendants) in which he categorically denied the statements alleged to have been made with reference to any acts of discrimination as set forth in the affidavits submitted by the Attorney General at the time of the filing of the complaint. Wilson further set forth that he has now and for some time has had a standing policy not to sell a home to an unmarried person — that in July 1962 Adolph Phillips, an unmarried Negro, came to the Dominguez Hills property and demanded that he be sold a home regardless of his marital status, that on at least one occasion Phillips had to be removed from the property by a peace officer, that Phillips engaged the services of CORE to assist him in his demands for a house, shortly thereafter he came to the property accompanied by the project coordinator for CORE and fifteen others whereupon the coordinator demanded that Phillips be sold a house irrespective of his lack of qualification — that thereafter many telephone calls were directed to the sales agent at the tract wherein it was threatened that legal action would be taken, his home would be picketed and dire consequences would follow unless the sale was made. The agent informed Phillips that he would not sell him a house because he was a single man and *furthermore because of his arrogant, belligerent and threatening tactics.* During the latter part of July 1962 the coordinator and two other persons visited Wilson as members of CORE and stated that they had come to make certain that a house in the tract would be sold to Phillips. The day following Wilson was told of the opinion in the *Burks* v. *Poppy Constr. Co.* case — (57 Cal.2d 463 [20 Cal.Rptr. 609, 370 P.2d 313]). Beginning about July 7, 1962, and almost continuously since CORE has caused various demonstrations by

having numerous marchers to discourage or prevent prospective buyers from visiting the sales offices and model homes, has caused many persons to enter the property, to dispense false, defamatory and inflammatory letters and handbills and has harassed prospective buyers, has caused many persons to sit or lie on the floors of the model homes and sales offices so as to prevent purchasers from entering, has caused persons to pose as prospective buyers to consume the time of salesmen and has caused certain entrances of defendants' property to be blocked off. Copies of some of the handbills and letters are attached and made exhibits with the affidavit and by stipulation are before this court.

Wilson further set forth that as of the date of the filing of the opinion in the *Burks* v. *Poppy Constr. Co.* case "not one single qualified buyer has been refused the right to purchase a home in any tract in which" he had an interest "because of ... race, color or national origin." Further that in the Dominguez Hills tract it is required that a prospective buyer fill out a credit report (such reports being referred to as 'applications' by the Attorney General in the complaint)— that during the time set forth in the complaint many such 'applications' have been dispensed to Negroes and not one such 'application' has been completed and returned — that not one of the persons named in the complaint appeared to be a qualified or sincere buyer. Also that his attorneys were instructed to request of the Attorney General and other law enforcement agencies that they take such legal steps as were necessary and proper to stop the continued trespassing and other violations of the laws by CORE and its members — that the governmental agencies declined to make arrests and the Attorney General stated in effect that *"he would not arrest any member of CORE for trespass because, in his opinion, the picketing and trespass would not occur if discriminatory practices were not being conducted"* — *"that the acts complained of were personal in nature and a matter which should be handled"* by *the subdividers themselves.* No counter affidavit by the Attorney General ever was filed nor is there any statement in the record which in effect contradicts or denies the above set forth assertions. Pictures are also attached to the affidavit which depict some beatnik type individuals, each with a large CORE badge around his or her neck, sitting on the floor in the offices of the subdividers, all close together, to the end that an employee or officer of the subdivision enterprise would either have to jump over or step on one or another of the "sit ins" to get to his desk and

further to the end that a prospective purchaser would find it next to impossible even to enter the office let alone to get to the desk of an employee of the subdivider to talk business. Pictures are also attached showing sign-carrying marching pickets blocking the driveway entrances near the sales office. Other affidavits of salesmen and others were filed which in effect deny the statements of discrimination contained in the affidavits filed by the Attorney General.

The motion to dismiss and the order to show cause were transferred on April 3, 1963, to the department of the Superior Court where Judge Gitelson presided. On April 8, 1963, an application for a temporary restraining order pending the hearing of the order to show cause was filed by the Attorney General. The file does not show that a copy of the application was served upon the defendants. The judge on April 8 made what appears to be in effect an ex parte order restraining the defendants. The order is anomalous in some respects in that it is set forth therein as follows: ''[I]t appearing to the satisfaction of the court . . . that this is a proper case for granting a temporary restraining order, and that unless the temporary restraining order prayed for ... be granted great injury will result to the plaintiff before the matter can be heard on notice.'' (The cause theretofore had been set for hearing on April 16, 1963.) There follows the directive to the defendants not to refuse to sell their housing accommodations on grounds of race, color, religion, ancestry or national origin and not to refuse to enter into sales discussions within the named housing tract for the reasons above mentioned. Lastly the court set forth specifically that it had ''not had the opportunity to familiarize itself with all of the pleadings, affidavits and other papers filed by the parties,'' and that by the restraining order the judge did not *in any way find or intend to infer that Don Wilson or any of the defendants have in any way discriminated against any person whomsoever or that any of them evidenced any intention to discriminate against any person whomsoever.* It is difficult to ascertain just what the order was based upon if it was not the affidavits of the CORE members and the alleged discrimination of Wilson, yet the judge states in effect that he found no discrimination and that there was no evidence of any intention to discriminate against anybody.

On April 16 the demurrer and the motion to dismiss were heard and the defendants were given 10 days within which to submit added authorities as to whether the Attorney General

had the capacity to sue. The cause was continued to May 6 at which time the case was ordered to stand submitted.

On May 20, 1963, the judge ordered that "unless restrained from so doing . . . on or before June 24, 1963" he intended "to hold that the People ... have the power to maintain this action and the Attorney General has the capacity to sue." A part of the temporary order previously made was modified. On the next day, May 21, 1963, the court with counsel talked with reference to the wording of the restraining order and the matter was continued to May 28 at 12 noon.

On June 21, 1963, the judge ordered the motion to dismiss, demurrer and order to show cause continued to July 22, 1963, a petition for a writ of prohibition having been filed by petitioners herein (defendants below) in this court on June 18, 1963, and further that he would rule in favor of the state on July 22, 1963, unless he was restrained. On July 22, 1963, an alternative writ of prohibition having been granted previously by this court, the cause was continued to August 19, 1963.

The main question is whether under the circumstances of this case, the Attorney General has the power to file an action under the provisions of Civil Code, sections 51 and 52[1] as is attempted here. In my opinion he does not have such power.

It is necessary for a proper consideration of this case to review the background of the Civil Code sections—in other

[1] "§ 51. [Citation of section: Civil rights of persons in business establishments.] This section shall be known, and may be cited, as the Unruh Civil Rights Act.

All persons within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every color, race, religion, ancestry, or national origin."

"§ 52 [Denial, discrimination, etc., contrary to § 51: Liability in damages.] Whoever denies, or who aids, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of color, race, religion, ancestry, or national origin, contrary to the provisions of section 51 of this code, is liable for each and every offense for the actual damages, and two hundred fifty dollars ($250) in addition thereto, suffered by any person denied the rights provided in section 51 of this code."

words, what was the atmosphere in which they had their beginnings and what was law with reference to the powers given to the Attorney General.

A search of the debates and the proceedings leading up to the adoption of the Constitution of 1849 indicates that there was little discussion with reference to the office of Attorney General and nowhere therein is there set forth anything with reference to the duties or powers of such officer. Neither was there any particular concern with what we have come to refer to as civil or equal rights. The common law of England was adopted as the rule of decisions insofar as it was not repugnant to the Constitution or statutes of the state. (Cal. Stats. 1850, ch. 95, p. 219; Civ. Code, § 22.2.) California history indicates that at the time the state was organized in 1849 and for some several years thereafter many southerners were influential in the state government and otherwise and their influence is reflected in many statutes. The statutes of 1850, chapter 140, page 424, set forth the law against miscegenation and such remained the law in one form or another until 1948 when it was invalidated in *Perez* v. *Sharp*, 32 Cal.2d 711 [198 P.2d 17].

The Civil Practice Act (Stats. 1851, ch. 1, § 394, p. 113) provided that no Negro should be allowed to testify as a witness in any action in which a white person was a party. Section 14 of the Criminal Act of 1850 (Stats. 1850, ch. 99, § 14, p. 230) provided that ''[n]o black or mulatto person . . . shall be permitted to give evidence in favor of, or against, any white person.'' See *People* v. *Hall*, (1854) 4 Cal. 399, 403, where the statute was applied to Chinese; also *Speer* v. *See Yup Co.* (1859) 13 Cal. 73. See also *People* v. *Howard*, (1860) 17 Cal. 63.

In 1866, after the Civil War and before the Fourteenth Amendment to the United States Constitution was adopted, Congress passed the first of the so-called Civil Rights Acts (14 Stat. 27 (1866)). In 1869 the question arose in this state in the case of *People* v. *Washington*, 36 Cal. 658, whether the Civil Rights Bill of Congress overruled California law to the effect that certain persons (Chinese) could not testify for or against any white person. Washington was a Negro and was charged with robbing a ''Chinaman'' — the only witnesses to the crime were other ''Chinamen.'' The court held in effect that by the Civil Rights Bill the Negro born in this country was placed in respect to his civil rights on the same footing with the white man. Assuming his new status, then a

"Chinaman" could not under the statute testify against a white person, ergo, he could not testify against a Negro, who by act of Congress was endowed with the same civil rights that appertain to white persons. In 1870 the court in effect repudiated the decision in *People* v. *Bradly* (1870) 40 Cal. 198 [6 Am.Rep. 604]. The rule was changed with the adoption of the codes in 1872.

The School Law of California passed April 4, 1870, (Stats. 1869-1870, p. 838) provides that every school shall be open for the admission of white children residing within the school district - that the "education of children of African descent, and Indian children, shall be provided for in separate schools." (§ 56.) Section 117 of the regulations adopted by the school board provided in part: "Separate schools - Children of African or Indian descent shall not be admitted into schools for white children, but separate schools shall be provided for them in accordance with the California School Law." In *Ward* v. *Flood*, 48 Cal. 36 [17 Am.Rep. 405], petitioner, a Negro, sought entrance to a white school in San Francisco and the petition was denied.

In Congress in 1875, "An Act to Protect all Citizens in their Civil and Legal Rights" was adopted (18 Stat. 335). The act in effect prohibited the denial of equal facilities in inns, theatres, public conveyances and places of public amusement on the basis of race or color. The act was challenged and resulted in the decision generally referred to as the *Civil Rights Cases* (1883) 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835] where the court held in effect that the act was unconstitutional—that private discrimination was not prohibited by either the Thirteenth or Fourteenth Amendments to the United States Constitution. It is interesting to note that one of the cases in the group was with reference to an information "for refusing a colored person a seat in the dress circle of Maguires' theatre in San Francisco." (*United States* v. *Ryan*, 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835].)

Thereafter several of the states adopted civil rights laws. The original predecessor of the civil rights statutes of California was obviously copied from the congressional act of 1875. It is noteworthy, however, that the federal act provided for damages to be paid to the person aggrieved, to be collected "in an action of debt" and further a violation of the act was made a crime punishable by fine and imprisonment. A right of election was provided to the aggrieved person as to whether to sue for the penalty or to proceed otherwise.

California saw fit specifically to omit the provisions making a violation of the act a crime and gave no election of remedies and particularly was it provided that "any person who is refused admission," etc., is entitled to recover "his actual damages and one hundred dollars in addition thereto." This was no oversight upon the part of the Legislature. No officer of the state or otherwise was given a right to file a complaint or otherwise to participate in such an action.

The California Constitutional Convention in 1879 considered the matter of the office of the Attorney General and so far as I am able to ascertain there was no discussion or debate of any consequence in the convention with reference to the powers and duties of such officer, and the Constitution which was adopted at that time contains nothing with reference to the powers and duties of the Attorney General. His powers were previously set forth in Political Code, section 470, and so continued until 1934.

As heretofore indicated the Legislature in 1893 (Stats. 1893, ch. 185, p. 220) adopted what ultimately became sections 53 and 54 of the Civil Code. In 1897 (Stats. 1897, ch. 108, p. 137) the predecessor to sections 51 and 52 of the Civil Code was adopted. No case was ever brought (and so far as I can find no attempt was ever made to bring a case) by any Attorney General under any of the mentioned statutes prior to the 1959 amendments.

Penal Code, section 365, adopted in 1872, made it a misdemeanor for any innkeeper or common carrier to discriminate upon the grounds of race or color. See Klein, *The California Equal Rights Statutes in Practice* (1958) 10 Stan. L.Rev. 253, for a further history of the statutes and further where the author in conclusion states that in California the fact has been recognized, both legislatively and judicially that discrimination based upon race or color is incompatible with the best interests of society and that for the statutes involved to protect the rights with which they are concerned several changes need to be considered. The author then in effect suggested that *the laws be amended* to include criminal sanctions, to broaden the scope of the laws to include all situations where services or products are offered to the public and that *"enforcement could be further promoted by furnishing the Attorney General with the power to seek equitable restraint by way of injunction in suitable cases upon violation of the statutes."*

In 1934 an initiative constitutional amendment known as

Proposition No. 4 was voted upon and adopted by the voters. The measure is now article V, section 21, of the Constitution and in effect declares the Attorney General to be the state's chief law officer, that he shall see to it that all state laws are enforced, that he shall have direct supervision of district attorneys and sheriffs and other enforcement officers and shall require written reports, and empowers the Attorney General to prosecute with district attorney power, to assist district attorneys when the public interest requires *and perform other duties which may be prescribed by law.*

Earl Warren, then District Attorney of Alameda County, presented the written argument which appeared in the pre-election pamphlet sent to every voter prior to the election at which the proposition was to be voted upon. The argument in its entirety has to do with the conviction of criminals, such as the "Dillingers," the "Baby Face" Nelsons, the "Machine Gun Kellys," how the criminal gangs have played "hide and seek with public authorities" and become a "National disgrace." There was the further argument that the fault was in the lack of organization of the law enforcement agencies, that one operated as we did in "horse and buggy" days, that the proposal on the ballot would make possible the coordination of law enforcement agencies, that the *proposition merely enlarged the duties of the Attorney General so as to give him that supervision and make him responsible for the uniform and adequate enforcement of the law* throughout the State "... *in short, the Attorney General is made the supervisor and coordinator for our county law enforcement agencies."* Not a word is contained in the constitutional provision or in the argument urging its adoption to the effect that the Attorney General shall have the power to institute any action of any similarity to the present action.

In 1959 sections 51 and 52 of the Civil Code were amended. The bill as introduced in the Assembly on January 21, 1959, provided in short that all citizens, no matter what their race or color, would be entitled to full and equal admittance, accommodations, membership in all public or private groups, associations, business establishments, to purchase real property and to obtain the services of any professional person — whoever denied such or made any discrimination on account of color was to be liable for actual damages and $500 in addition thereto, the prevailing party to be awarded costs and attorneys' fees.

The bill went to the judiciary committee where on March 24 an amendment was offered which in effect excepted certain

institutions organized for furthering certain religious beliefs "or a specific national culture" with limited memberships. Under a March 30 amendment the reference to prohibition of discrimination by "private groups" and the right "to purchase real property" and the provisions with reference to costs and attorneys' fees were eliminated from the bill.

The bill provided that it would apply to "all business establishments of every kind whatsoever," to schools (except those of a specific sectarian belief), to any organization receiving a tax advantage or exemption, to business and professional organizations and any person licensed by the state — or subdivision thereof.

On April 24 the bill was amended to limit both the religious schools and those receiving tax advantages to more or less specific situations.

On May 12 the Assembly adopted the bill with some further amendments with which we are not here concerned and the bill went to the Senate. In the Senate Governmental Efficiency Committee amendments were offered and adopted. The amendments struck out of the bill the provisions with reference to charitable benefits, the business and professional organizations and professional people licensed by the state or otherwise. After the bill was finally amended in the Senate it referred only to "all business establishments of every kind whatsoever" and reduced the recoverable damages to actual damage and $250 in addition thereto. The bill was finally adopted by both houses of the Legislature as cast and set forth in Civil Code sections 51 and 52 (1959). There are in fact some changes between the former code sections and the present sections none of which however has anything to do with this case. See *The 1959 California Equal Rights in Business Establishments' Statute — a Problem in Statutory Application* by Horowitz (1960), 33 So.Cal.L.Rev. 260.

It is important here however to note particularly that nowhere at any time was there an amendment offered to the bill in either house of the Legislature to provide that the Attorney General should have the power to file complaints or to do anything under the particular law as adopted. It is apparent that what the Legislature did was to enact into law a principle creating a right not to be discriminated against on grounds of race in some, but not all, relationships between private persons.

In the 1959 (the year of the adoption of the Unruh Act) regular session of the Legislature there was also introduced

and passed into law the Hawkins Act (Health & Saf. Code, §§ 35700-35741) which related to discrimination in "publicly assisted housing accommodations." (Stats. 1959, ch. 1681, p. 4074 — Assembly Bill 890.) There was no provision therein (nor was any proposed in the original bill as introduced by the author) for the Attorney General to file complaints or otherwise appear.

In 1961 at the next regular session of the Legislature two bills (identical with reference to the question here involved) were introduced in the Assembly, A. B. 801 by Hawkins, and A. B. 2954 by Bruce Allen, which proposed that there be added to the Health and Safety Code a provision that "the Attorney General may, in like manner, make, sign, and file such complaint." A. B. 801 finally wound up by being referred to the Rules Committee for assignment to an interim committee and A. B. 2954 died in the committee to which it was assigned.

In the last regular session of the Legislature, Assembly Bill No. 1240 was introduced (the author of the Unruh Act not being a coauthor) which according to its title had to do with "Discrimination in Housing" (Health and Safety Code — division 24, part 5), the specific subject matter with which we are here concerned. I am fully aware of the fact that though the bill was passed by the Legislature and signed by the Governor it is not yet the law at the time of the writing of this opinion (August 1963) ; however, the expression of legislative intent has been made in a crystal clear manner and for that purpose all has been done which can be done.

The Legislature established the public policy of the state to be in opposition to the practice of discrimination because of race, color, religion, national origin or ancestry in housing matters. The bill set forth a broad definition of what constitutes a housing accommodation, public assisted housing accommodation, owner and multiple dwelling and it declares it to be unlawful (§ 35720, subd. 6)—"For any person subject to the provisions of section 51 of the Civil Code, as that section applies to housing accommodations, as defined in this part, and to transactions relating to sales, rentals, leases, or acquisition of housing accommodations, as defined in this part, to discriminate against any person because of race, color, religion, national origin, or ancestry with reference thereto."

The enforcement of the provisions of the bill is left to the "State Fair Employment Practice Commission" created by section 1414 of the Labor Code. The commission is given the

power to meet and function, *appoint an attorney* and other personnel, to hold hearings, create advisory agencies, to adopt rules and to receive and hear complaints with reference to discrimination in housing accommodations. Any person claiming to be aggrieved may file a verified complaint with the commission; however no complaint may be made unless the complainant waives any and all rights under section 52 of the Civil Code. In the bill as originally introduced it was set forth: *The Attorney General may, in like manner, make, sign and file such complaint. The last clause was later specifically amended out of the bill.*

The bill further recites that the commission can proceed upon any complaint with the powers as enumerated in the Labor Code (with some exceptions) and then follows a specific provision which was amended into the bill to the effect that *"the Attorney General may not make, sign, or file a complaint under this part."* (Italics added.) (§ 35731.)

After certain hearings and other procedures the commission is authorized to bring an action in the superior court to enjoin the owner from taking further action. The statute concludes with a proviso that "[n]othing contained in this part shall be construed to prohibit selection based upon factors other than race, color, religion, national origin, or ancestry" — and that "[n]othing contained in this part shall be construed to, in any manner or way, limit or restrict the application of section 51 of the Civil Code."

The changes and the amendments made in the proposed law involved elements of choice — the choice finally being that the Attorney General was not to be permitted to file complaints and appear as he attempts to do in the present case. It is difficult to imagine how the Legislature could have spoken more clearly with reference to whether the Attorney General can file a complaint in a housing discrimination case. It first struck out a provision which would have permitted such a course and then inserted an amendment stating specifically that he could not file such a complaint. Legislation (that adopted by the Legislature or by the initiative process) is ordinarily the clearest expression of the will of the people. Had the Legislature been of the mind to permit the Attorney General to file complaints in housing accommodation cases it would have said so long ago. A backwardness and slowness in adopting statutory laws, or the want of facility for passing laws are not among the evils of our times.

The Legislature could have (as did the Illinois Legislature

in 1935) empowered the Attorney General to take enforcement measures and to investigate complaints in discrimination cases. (Ill. L. (1935) §1, added to Smith-Hurd Ann. Stat. (Supp. 1952) C-38.) Or it could have followed the action of New Jersey in 1944 (N.J. Stat. § 52:17a-4d). Or it could have followed New York's law. (Executive Law (McKinney 1951) § 63.)

In New Jersey in 1949 the Legislature entrusted to its Division against Discrimination the added duty of enforcing that state's equal accommodation law (N. J. Rev. Stat. (Cum. Supp. 1950) § 18.25.8). Similar delegations of authority have been made to the antidiscrimination commissions of Connecticut (Conn. Gen. Stat. (Supp. 1951) § 10408b), Massachusetts (Mass. Gen. Laws (1950) C 151b, §1) and Rhode Island (R. I. Gen. Laws (1938) C 606, §§ 28, 29). The fact remains however that after months of consideration the California Legislature did not adopt any such law as above set forth.

Ours is not the situation where there is some ambiguity in the statute or where there is some murky terminology or where there is a gap to be filled. There are no words anywhere which in anywise direct or imply that the Attorney General has the power to proceed as here attempted.

It is not our function to recast the statute. It is our function to interpret the statutes — but a good interpreter does not put in words that are not present. Ordinarily the expression of one thing indicates the exclusion of its opposite — otherwise every statute will have to contain all of the negatives which can possibly arise.

Our guidepost must be the legislative intent and nothing more.

I am not willing to attribute to the Legislature the absurdity that it intended the Attorney General to have the power to file complaints and appear under the broader and more comprehensive provisions of sections 51 and 52 of the Civil Code (which includes housing discrimination) but that he should be prohibited from filing such complaints under the less comprehensive and more restricted provisions of Assembly Bill 1240 (Stats. 1963, ch. 1853), which specifically deals with discrimination in housing.

There is a paucity of cases in this state on the question of extent of the Attorney General's powers — presumably because, except on rare occasions no holder of that office has seen fit to go beyond the clear provisions of the law as written. In *People* v. *Brophy* (1942) 49 Cal.App.2d 15 [120

P.2d 946] the then Attorney General Earl Warren in his capacity as such directed a letter to the telephone company to discontinue its service to Brophy because the latter was engaged in illegal activities with reference to bookmaking. The company responded by writing a letter to the subscriber (Brophy) wherein it set forth the receipt of the letter from the Attorney General and in substance the contents thereof and with a concluding statement that telephone service was being discontinued on a certain date. Brophy sought an injunction to enjoin the company from so proceeding. The Attorney General filed a complaint in intervention setting forth that to grant the injunction would enable the applicant to assist in the violation of the law (bookmaking). The injunction proceedings were ultimately dismissed and Brophy was charged with perjury in the filing of an affidavit in the case to the effect that he was not connected with gambling interests. The question immediately arose whether the Attorney General had the power to do what he had done. In writing on the question, this court through Mr. Justice Thomas P. White stated after setting forth section 21, article V, of the Constitution as follows:

*"If the powers of the Attorney General are thus limited in the most direct performance of the duties of that offce,* by what authority may that official invade the affairs of other governmental agencies in general and public utility companies in particular? If there is any such authority at all, it must be by virtue of the first sentence of section 21, which as above noted reads as follows: 'The Attorney General shall be the chief law officer of the state and it shall be his duty to see that the laws of the State of California are uniformly and adequately enforced in every county of the state.' Manifestly, enforcement of the laws contemplates enforcement according to law, the procedure for which is definitely established. There is nothing in section 21 of article V which authorizes the Attorney General to depart from that procedure; and in that connection, no provision has been called to our attention, nor have we been able to find any, which directly or indirectly empowers the Attorney General to issue any orders in the nature of those contained in the letter to the telephone company. The expression, 'the Attorney General shall be the chief law officer,' as provided in section 21 of article V, obviously confers no such authority, for at most such an expression, interpreted in the light of the limitations that follow, can be no more than descriptive, and vests no more authority in the Attorney

General than the expression in section 1 of article V, viz., 'The supreme executive power of this state shall be vested in a chief magistrate, who shall be styled the governor,' vests in the governor.

"It is evident from the foregoing that the law vests no authority in the office of the Attorney General to order a telephone company to discontinue its service, and this being true the telephone company was not bound to abide by the order of the Attorney General, as was done in the circumstances disclosed by the record herein." (Italics added.)

Section 12512 of the Government Code[2] does not in any wise extend the powers of the Attorney General as set forth in the Constitution and the law means that he can only prosecute when the state is a proper party. It does not mean in effect that the Attorney General shall have a key to every door of every business establishment in the state of California via antidiscrimination proceedings—unless and until the Legislature so states.

The respondent and the majority of this court place great reliance upon what was said in *People* v. *Centr-O-Mart*, 34 Cal.2d 702 [214 P.2d 378]. Mr. Justice Carter, speaking for a divided court, pointed out in effect that if the legislative intent clearly appeared that the Attorney General should not be permitted to prosecute a case then and in such event the statute should be so interpreted. In *Centr-O-Mart* the court found that there was no intention expressed by the Legislature that the Attorney General should not file a complaint under the *Unfair Practices Act* (Bus. and Prof. Code, §§ 17000-17101). In the Unfair Practices Act a "person" who is entitled to bring an action is defined to be among others, a "municipal or other public corporation" (§ 17021). The definitions in the act are to be used in construing it. *There is no such comparable provision in the Unruh Act.*

The word 'person" does not include the state. (*Berton* v. *All Persons, etc.*, 176 Cal. 610, 617 [170 P. 151]; *Bayshore Sanitary District* v. *County of San Mateo*, 48 Cal.App.2d 337 [119 P.2d 752].) A municipal corporation is simply a subdivision of the state (*Johnson* v. *City of San Diego*, 109 Cal.

[2][*Attendance at Supreme Court*: *Prosecution or defense of causes in which State or county a party*: *Exceptions.*] The Attorney General shall attend the Supreme Court and prosecute or defend all causes to which the State, or any state officer is a party in his official capacity; and all causes to which any county is a party, unless the interest of the county is adverse to the State, or some state officer acting in his official capacity."

468 [42 P. 249, 30 L.R.A. 178]. And undoubtedly the Legislature used the term in the Unfair Practices Act in its most comprehensive sense. Furthermore the Unfair Practices Act provides that a violation of its provisions shall constitute a crime—the Attorney General is quite obviously, as the chief law enforcement officer of the state, immediately in charge if he chooses to be.

The Unruh Act does not proscribe any specific conduct nor does it make any specific act a crime or unlawful (as above set forth in the Unfair Practices Act). The Unruh Act defines certain personal rights and then sets forth a provision to the effect that upon a denial of such personal rights the aggrieved person may sue and collect certain damages.

The case of *Pierce* v. *Superior Court,* 1 Cal.2d 759 [37 P.2d 453, 460, 96 A.L.R. 1020], cited by and heavily relied upon by the respondent is not in point. First of all the opinion was filed on Friday, November 2, 1934, prior to the election on Tuesday, November 6, 1934, at which time the constitutional amendment (Art. V, § 21) heretofore referred to was adopted and which sets forth the powers of the Attorney General and with which we are now concerned. Furthermore that case had to do with a proceeding to cancel alleged fraudulent registrations of voters in Los Angeles County. The very essence of the case is that thousands of voters in the county were about to be deprived of their right to vote without any notice or opportunity to be heard. The Attorney General brought the action to cancel certain alleged fraudulent registrations of voters — it was proposed that some 24,000 defendants appear and show cause why their registration should not be cancelled. The trial court found that it was impractical to serve the defendants personally and ordered that a news item be inserted in the daily papers which in effect would give notice where the defendants could ascertain whether they had been sued. Later by a supplemental order postal cards were to be sent to the defendants — personal service was specifically dispensed with. The argument of the petitioners for the writ of prohibition was that the court had no jurisdiction of the subject matter and if it did have it had no jurisdiction of the defendants who had not been personally served.

The court stated that the state had the right to purge the great register of fraudulent registrations — upon the theory, among others, that it was the state which had to provide for and insure honest elections. In other words, *Pierce* was *clearly not a private dispute between two individuals or*

*groups of private individuals but to the contrary was a dispute between the state itself and some 24,000 alleged fraudulent voters.*

The cases cited in the *Pierce* case are of no assistance to the present respondent. In *People* v. *Stratton*, 25 Cal. 242, the Attorney General brought an action to cancel a patent for lands granted by the Governor of the state to the defendant, the claim being that the defendant had falsely represented the lands in question as being swamp or overflowed lands when in fact they were high lands. The court pointed out that the 1849 Constitution was silent as to the powers and duties of the Attorney General and set forth in résumé the statute (Stats. 1850, p. 55) which has to do with the duties of the law officer of the state. The court concluded at page 249: "If the State had no interest in the subject matter of the proceeding commenced to set aside the patent granted to the defendant, it is difficult to understand upon what principle the information, as an information purely on behalf of the State, could be sustained. It is like a complaint that fails to state facts sufficient to constitute a cause of action, for the reason that it does not appear that the plaintiff has any interest in the subject matter of the action."

In *People* v. *Gold Run Ditch & Min. Co.*, 66 Cal. 138 [4 P. 1152, 56 Am.Rep. 80], the question was whether the defendant company as owner and operator of hydraulic mines on the banks of the American River had the right to dump its hydraulic debris into the river, to the endangerment of habitation and cultivation of large tracts of land upon which were built cities and towns and to the impairment of the navigation of the Sacramento River—and if there was no such right did the continuance of such a course constitute a *public nuisance*, that the state was bound to protect the people and "for that purpose the Attorney General, as the law officer of the State, has the power to institute a proceeding in equity in the name of the people, *to compel the discontinuance of the acts which constitute the nuisance.*" (Italics added.)

No one has ever asserted that the present proceeding is one to enjoin a nuisance.

In *People* v. *Beaudry*, 91 Cal. 213 [27 P. 610], the court simply held that the Attorney General had the power to enjoin the continuance of a nuisance, namely, the *blocking and obstructing of a public street*.

In *People* v. *Oakland Water Front Co.*, 118 Cal. 234 [50 P.

305], the court stated that the Attorney General could bring an action "in a case directly involving the rights and interests of the state." And further, although the question was not properly raised in the case, that "[w]hatever authority the Attorney General has to institute such a proceeding must be derived from the constitution and laws of the state, and if he has no authority we are bound to take judicial notice of the fact."

My colleagues state in effect that "the Supreme Court of this state has decided that persons who are engaged in the business of building and selling houses in a tract are operating 'business establishments'" and further that the Supreme Court has decided that "discrimination on the basis of race or color is contrary to the public policy of the state" and accordingly the Attorney General should be permitted to proceed with a complaint for an injunction.

It was not the Supreme Court which declared or settled the public policy of this state with reference to discrimination in housing upon the basis of color or race — it was the Legislature which made that determination and properly so. No court (where the Legislature had so clearly and unequivocally stated the policy) would presume to constitute itself as the voice of the community under such circumstances.

The fact that a course of conduct is wrong or injurious to the public does not necessarily mean that the Attorney General can file a complaint to have the person committing such a wrong stopped from doing so. There are innumerable situations which are against public policy and the public interest and the Attorney General has no right to appear therein simply because of a public policy violation. For example, usurious contracts are contrary to public policy and public interest, yet the courts have held that the attorney for the public so to speak could not proceed to enjoin the culprit in such a case. (See *People* v. *Seccombe*, 103 Cal.App. 306 [284 P. 725].) Anything which would debase a profession would be against public policy. However, see *People* v. *Steele*, 4 Cal.App.2d 206 [40 P.2d 959, 41 P.2d 946], where the state sought to enjoin chiropractors from practicing certain modes of treatment (practicing medicine without a license) and the court rejected a petition for an injunction. See also *People* v. *Lim*, 18 Cal.2d 872 [118 P.2d 472], where the people sought to enjoin a gambling establishment in Monterey and the writ was rejected. Further see *Kreling* v. *Superior Court*, 18 Cal. 2d 884 [118 P.2d 470], where the validity of a contempt

proceeding arising out of the Attorney General's attempting to enjoin a racing service publication was in issue — the court held the order was void. Contracts between husbands and wives to separate in the future are against public policy as are agreements which attempt to relieve the husband of his obligation for support to his family — would anyone argue that the Attorney General under the guise of a public policy violation can file a complaint and seek an injunction in such a matter?

It is apparent that whatever contravenes good morals or any established interests of society is against public policy; however, every violation thereof does not necessarily open the door to the Attorney General. Public policy is the equivalent of the policy of the law and it is not the policy of the law to permit the Attorney General to file a complaint in a housing discrimination case.

The Legislature has established the policy of this state and it is not up to this court or any other court for that matter in effect to write into the law of the state something which the Legislature has refused to do on more than one occasion. Public policy is not to be measured or determined by the private convictions or notions of any individual judge or group of judges but by referring to the legislative enactments, and if there be no pronouncements by the Legislature relevant to the subject matter at hand then and only then can one look to the decisions of the courts for a determination of public policy.

When the Legislature has clearly acted that action ought to be conclusive.

At the oral argument in the present case the Deputy Attorney General stated that they had had many talks with the "Wilson people and their lawyers — and have asked them to change their ways, *to obey the law and that is all we asked.*" Presumably this was done (as is suggested in 74 Harv. L.Rev. 526, 578 (1961)) as a quasi-legal body acting in the nature of an antidiscrimination commission. The law review article points out that such a course may be quite commendable and then that "on the other hand, the duplication of administrative effort, the possibility that an unsympathetic Attorney General may undermine an anti-discrimination program, and the desirability of placing public accommodations in the hands of a commission with broader powers and an experienced staff make it preferable to center all anti-discrimination activity in one agency." A question

from the bench was put (at the oral argument) as to whether the Attorney General's office also had asked the "representatives of CORE likewise *to abide by the law*" and the reply was not an answer to the question but a statement that "we are in favor of everybody abiding by the law" and then followed the statement, after a request for a direct answer to the question was made, that if any complaint had been made of unlawful picketing as of trespassing, counsel believed that it would have been turned over to the appropriate agency. Counsel for Wilson stated positively with reference to the directives of the Attorney General and the suggestions made at the meetings between the Wilson representatives, the Attorney General's staff and the representatives of CORE that: "It is true that we did have many discussions with the Attorney General's office, but these were not along the lines of mending our ways — to set the matter straight, we contend that we have always contended that we are not and have not been discriminating against Negroes or anyone else in the sale of these houses or any other houses. The conversation we had with the Attorney General was to the effect that he wanted us to put this in writing and we could see no reason why we should put our statement in writing . . . it was obvious at this time that the Attorney General's office was in close daily contact with this organization known as CORE and we did not want any writings to get into the hands of CORE. . . . *On many occasions . . . on more than one occasion I asked representatives of the Attorney General's office to do something to get these people out of our houses and out of our sales office. I told them they were trespassing, that this trespass was a crime and that we were entitled to some protection, too.* The first answer I got was that this was a matter for the District Attorney and not for the Attorney General's office. On one occasion, I asked Attorney General Stanley Mosk himself to do something about this, and he informed me, "*well, you are creating the problem by discrimination, therefore we feel they have a right to do what they are doing.*" There was no denial in court that such a conversation took place and that such words were spoken.

The implication here is that the subdivider must respect and obey the law under pain of the Attorney General's extending the long arm of the state or other severe penalty but that the law can be disobeyed by CORE and others with impunity. If that can be done in the administration of justice in this state then the time is not far distant when the rioters,

the blackjackers and the agitating mobs will seek to rule. To obey the law is the responsibility and obligation of every person whether he be of a minority group or otherwise and to foment lawlessness is inexcusable.

There can be little doubt as disclosed from the record in this case that it was the intent of a great number of the "sit ins" here involved to break the law in many respects. No one should be required (even assuming that a discrimination statute was violated by a subdivider as to an individual) in effect at the point of a gun to do as ordered by a mob. It follows without question that, when one group, dealing with a highly emotional racial problem, is repeatedly and for weeks upon weeks permitted to violate the law with impunity, the time is not far away until great and untold mischief will be done including among other things riots in the streets, beatings and other acts of violence.

One fraud can never be cured by another and still greater fraud, and minorities and majorities alike will do well to remember than no one can claim the protection of the right of free speech and at the same time incite others to acts of violence. Defiance and disorder display a strange and unusual sense of what constitutes the proper administration of justice. Each side of the controversy will do well to remember that for each right and privilege there is a corresponding obligation and duty which every good citizen must perform and that without obedience to and enforcement of the law there will be no civil rights. For any group, minority or otherwise, to conduct itself in an improper and illegal fashion is to reflect discredit to the group and unfortunately to foster dislike by others for what they seemingly believe in.

Lastly the petitioner represents and argues that the action in the superior court stems from a political motive and then follows certain claimed documentation of the assertion. With this (whether true or not true) I am not concerned; however history teaches that a mixture of coercion, political expediency and whim and caprice are not among the elements which make up the proper administration of justice.

I would grant the writ of prohibition.

A petition for a rehearing was denied October 7, 1963, and petitioners' application for a hearing by the Supreme Court was denied November 6, 1963. McComb, J., was of the opinion that the petition should be granted.